FILED
ELECTRONICALLY FILED
12/20/2013 10:07 AM
68-CV-2007-000633.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
KAREN DUNN BURKS, CLERK

2016 Feb-17  PM 03:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
## BESSEMER DIVISION

| | |
|---|---|
| Sharon **ROBERTSON**, as mother of Timothy Andrew Robertson, a deceased child, Plaintiff | ) ) ) |
| v. | ) Case No. **68-CV-2007-633** ) |
| **THE NINETEENTH ST. INV. INC.**, Ibrahim S. **SABBAH**, **SABBAH BROS. ENTER. INC.**, Defendants | ) ) ) ) |
| Jennifer **VICKERY**, Plaintiff | ) ) |
| v. | ) Case No. **68-CV-2007-783** ) |
| **THE NINETEENTH ST. INV. INC.**, Ibrahim S. **SABBAH**, **SABBAH BROS. ENTER. INC.**, Defendants | ) ) ) |
| Michael **WALDROP**, Plaintiff | ) ) |
| v. | ) Case No. **68-CV-2007-797** ) |
| **THE NINETEENTH ST. INV. INC.**, Ibrahim S. **SABBAH**, **SABBAH BROS. ENTER. INC.**, Defendants | ) ) ) |
| Tammy **HARDIN**, as mother of Brittany Caffee, Cross-Plaintiff | ) ) |
| v. | ) Case No. **68-CV-2007-633** ) |
| **THE NINETEENTH ST. INV. INC.**, Ibrahim S. **SABBAH**, **SABBAH BROS. ENTER. INC.**, Cross-Defendants | ) ) ) ) |

## FINAL CONSOLIDATED JUDGMENT

Before the Court are all remaining claims and parties in all of the above-styled actions that pertain to the automobile collision that occurred on May 2, 2007, and the sales of alcohol that preceded it.

## I.      Statement of the Case.

The basic allegation in all of these actions is that Defendant The Nineteenth Street Investments, Inc. ("Nineteenth") illegally sold alcoholic beverages to Brittany Caffee, a minor, from its "14th Street BP" convenience store in Bessemer, Alabama.[1]  It is alleged that Caffee became intoxicated as a consequence of these illegal sales and that she later that evening crashed the vehicle that she was driving.  It is further alleged that this collision was the cause of the death of one passenger and the injuries suffered by the other passengers.  All four occupants of this vehicle were minors.

In Case Number 68-CV-2007-633, Plaintiff Sharon Robertson brought punitive damages claims against Nineteenth for the death of her minor son, Timothy Andrew Robertson ("Drew"), pursuant to the Dram Shop Act (Ala. Code § 6-5-71) and the Wrongful Death of a Minor Statute (Ala. Code § 6-5-391).

In Case Numbers 68-CV-2007-783 and 68-CV-2007-797, Plaintiffs Jennifer Vickery and Michael Waldrop (respectively) brought their own personal injury compensatory and punitive damage claims against Nineteenth under the Dram Shop Act.[2]

In Case Number 68-CV-2007-633, Plaintiff Tammy Hardin, the mother of Caffee, brought punitive damage claims against Nineteenth under the Civil Damages Act (Ala. Code § 6-5-70).[3]

---

[1]  The store was referred to by this trade name and by its previous trade name "Liberty Highway 150 Convenience Store" during trial.

[2]  These claims were originally brought by their parents.  Upon reaching majority, Jennifer and Michael were substituted as party plaintiffs.

[3]  Hardin's claim was brought as a cross-claim in the Robertson action.  Caffee, who was originally a defendant

The Plaintiffs also alleged in all four actions that Defendants Ibrahim S. Sabbah ("Sabbah") and Sabbah Brothers Enterprises Inc. ("SBE") were liable for any judgment rendered against Nineteenth on equitable veil-piercing and/or alter-ego grounds.

## II.   The Legal Claims for Damages.

The Alabama Supreme Court has held that "[w]hen legal and equitable claims are presented in one action, the trial court must resolve the equitable claims in a way that does not impinge on a party's right to a jury trial as to the legal claims."[4] "Purely legal claims, as well as factual issues common to the legal and equitable claims, must be determined by a jury; the remaining issues are then to be decided by the trial court." *Id.* "Accordingly, when both legal and equitable claims are joined in one action, then, the trial judge must arrange the order of trial so that the judge's decision on the equitable issues does not operate to deny a trial by the jury of the legal issues." *Id.* "A jury *first* must decide any factual issues that are purely legal in nature, along with any factual issues common to the legal and equitable claims." *Id.* "Once those factual findings are made, the trial judge must determine the remaining equitable issues." *Id.* "In addition, those factual questions that are purely legal in nature, as well as those common to the legal and equitable issues, must first be decided by the jury." *Id.*

Pursuant to these directives, this Court held a jury trial on all of the Plaintiff's legal claims for damages against Nineteenth in early February of 2013. The jury returned verdicts on February 8, 2013, in favor of the Plaintiffs and against Nineteenth and assessed $15,150,000.00 in damages as follows:

---

in that action, has been dismissed by Robertson.
[4] Wootten v. Ivey, 877 So. 2d 585, 589 (Ala. 2003)(citations omitted, bold added)(*quoting in part Ex parte Thorn*, 788 So. 2d 140, 144-145 (Ala. 2000)(*quoting in turn* Dairy Queen v. Wood, 369 U.S. 469, 470 (1962))).

(1)     An award of $7,000,000.00 in punitive damages to Plaintiff Sharon Robertson for the death of Drew.

(2)     An award of $900,000.00 in compensatory damages and $3,000,000.00 in punitive damages to Plaintiff Jennifer Vickery for her personal injuries.

(3)     An award of $750,000.00 in compensatory damages and $3,000,000.00 in punitive damages to Plaintiff Michael Waldrop for his personal injuries.

(4)     An award of $500,000.00 in punitive damages to Plaintiff Tammy Hardin.

### III.     The Equitable Theories of Recovery Against Mr. Sabbah and SBE.

The second phase of trial came before the Court without a jury in late October of 2013. This Court, sitting as fact-finder, considered all of the evidence that it heard during the jury trial as well as all new evidence presented on the Plaintiffs' veil-piercing and alter-ego equitable theories and Defendants' defenses thereto.  Specifically, the Court heard live testimony from (1) Plaintiffs' expert, J. Lester Alexander III, (2) Defendant Ibrahim Sabbah, and (3) Defense expert, Bryan Hirsch. The Court also admitted and considered deposition testimony from Defendant's independent bookkeeper, Barbara Jones, and from Mr. Sabbah. Numerous financial records, banking records, corporate records, and other documents were admitted into evidence.

### A.     Motion for Judgment as a Matter of Law.

Defendants moved for judgment as a matter of law at the close of evidence in the non-jury trial. The Court deferred ruling on the motion at the time. Because there is substantial evidence to support Plaintiffs' veil-piercing and alter-ego and theories, said motion is DENIED.

**B.     Findings of Fact.**

**1.     Substantial Similarity.**

There is substantial similarity of identity between Mr. Sabbah and the corporate defendants, Nineteenth and SBE.  Mr. Sabbah was at all times the sole shareholder, officer, and director of SBE. Mr. Sabbah was at all times the sole officer and director of Nineteenth and, as discussed below, was the *de facto* owner of all shares of Nineteenth since at least May 2005.

a)     The initial articles of incorporation and subsequent reports to the Alabama Secretary of State show that both Nineteenth and SBE shared the same physical address: 31 19th Street South, Bessemer, Alabama 35020.

b)     This address is, in fact, the address of another convenience store owned, operated, and controlled by Mr. Sabbah.

c)     The initial articles of incorporation and other documents for both corporations show a mailing address of Post Office Box 36661, Birmingham, Alabama 35236.

d)     This same post office box is used as a personal address by Mr. Sabbah and is shown as his address on his Alabama driver's license.

e)     Both SBE and Nineteenth are shown on various documents as being located at the address of the 14th Street BP convenience store, at 600 14th Street, Bessemer, Alabama.

**2.     Sabbah owned and controlled Nineteenth prior to February 3, 2007.**

On May 2, 2007, the date of the underlying alcohol sale and the subsequent vehicle crash, Nineteenth was operating a convenience store known as the "14th Street BP," which was originally known as the "Liberty Highway 150 Convenience Store" and was operated by Nineteenth from 2004

through the date of the accident. Nineteenth was originally incorporated by and operated by an individual known as Ayman YousefNasser. SBE owned the building in which the convenience store was operated and acted as a landlord to Nineteenth. YousefNasser eventually sold his interest in Nineteenth to SBE, and on May 2, 2007, SBE was the sole shareholder of Nineteenth. Sabbah was, in turn, the sole shareholder of SBE.

The date on which SBE actually acquired the shares of Nineteenth is in dispute. It is also disputed whether SBE acquired Nineteenth's shares or whether Sabbah personally acquired the shares. Certain corporate documents indicated that a share transfer occurred between YousefNasser and SBE on February 3, 2007. Other evidence indicated that Mr. Sabbah was the owner of the Nineteenth shares and that he had acquired the shares as early as May 2005. This evidence is overwhelming and includes (but is not limited to) the following:

a)    Mr. Sabbah was the sole signator on a Nineteenth BBVA/Compass checking account opened in May 2005.

b)    Mr. Sabbah identified himself as the "owner" of Nineteenth on the signature card opening that account in May 2005.[5]

c)    Mr. Sabbah approved hires for Nineteenth Street and directed its bookkeeper, Barbara Jones, to add certain individuals to the Nineteenth Street payroll in 2006.

d)    Mr. Sabbah directed that Jones should use various corporate accounts that he controlled to pay the corporate tax obligations of his various companies, often

---

[5] Mr. Sabbah was also a signator on the two SBE checking accounts where he was designated as the "president/secretary" and "owner" of SBE.

directing her to pay one corporation's tax obligations out of another corporation's bank account. These transactions occurred as early as 2005.

e)    Mr. Sabbah directed numerous payments of Nineteenth's tax obligations out of SBE accounts.

f)    Nineteenth's payroll records show Mr. Sabbah as a regular Nineteenth Street employee beginning in 2005. Mr. Sabbah testified that he did not become a Nineteenth employee until after he acquired control of the corporation.

g)    Barbara Jones identified Mr. Sabbah as the "owner" of Nineteenth in a memo she wrote to a third party in June 2006 regarding Nineteenth's payroll.

h)    Jones also testified that Mr. Sabbah acquired the Nineteenth shares and business from Yousef Nasser well before 2007.

i)    Jones testified that Mr. Sabbah "probably" took over Nineteenth following a building remodel that was completed in May 2005, but that he was certainly operating the store as its owner in June 2006, when a memo she wrote to a third party referred to Sabbah as the "owner" of Nineteenth.

j)    Jones testified that formal corporate documents were often executed after the fact in Sabbah's businesses.

k)    Jones further testified that she recognized Sabbah's signature on certain Nineteenth checks written in 2005. She testified that an August 2005 check to Sam's Club from Sabbah's personal account with the memo "cigs-Liberty" on it would have purchased inventory for Nineteenth's convenience store.

l)      Jones testified that Mr. Sabbah would direct her to pay sales tax obligations of certain corporations out of another corporation's checking accounts. These checks were dated in 2005.

m)     Jones testified that numerous Nineteenth BBVA/Compass checks were signed by Mr. Sabbah prior to February 2007.

n)     Mr. Sabbah's personal checking account was used to make purchases of Nineteenth's inventory on multiple occasions, and as early as August 2005.

o)     Nineteenth's 2007 tax returns do not show any transfer of its shares during that tax year.

p)     Mr. Sabbah testified in other litigation that he acquired his interest in Nineteenth as early as 2004.

Based on all of this evidence, the Court finds that Mr. Sabbah was the sole shareholder of SBE, that he exercised complete and total domination and control over the operations of both SBE and Nineteenth beginning in at least May 2005, and that SBE or Sabbah was the de facto (if not the actual) owner of all Nineteenth shares beginning in May 2005.[6]

### 3.    Lack of Observance of Corporate Formalities.

In addition, there was a near-complete lack of observance of corporate formalities in the records of both SBE and Nineteenth. This evidence is also overwhelming and includes (but is not limited to) the following:

---

[6] Whether Mr. Sabbah was ever the owner of "record" of all the Nineteenth shares is immaterial. He certainly acted as if he was. In 2007, tax returns showed him as the 100% shareholder of all of Nineteenth's shares. In that year, Nineteenth was deemed to be a subchapter "S" corporation, and all of its profits were paid directly to Sabbah and reported on his personal tax returns on a K-1. The fact that once again normal corporate formalities were not followed - - for example, transferring shares on the record from SBE to Sabbah or making a formal conversion from a c-corporation to an s-corporation - - is further evidence that supports the Court's conclusions here.

1.      There were no regularly-conducted shareholder meetings and no regularly-conducted directors meetings of either Nineteenth or SBE.

2.      Very few corporate documents were created or regularly kept.[7]

3.      Except as noted, no minutes or other record of any meetings were kept, and no other regular written records of corporate decisions, transactions, or other events were maintained by either Nineteenth or SBE.

4.      There were no bylaws adopted for either SBE or Nineteenth.

5.      There are no writings that memorialize any loan, dividend payment, or monetary transfer between or among Mr. Sabbah, SBE, or Nineteenth, despite evidence of substantial transfers of cash and funds between them.

---

[7] The only corporate documents that were produced were admitted into evidence, and the sum total of those documents were:

a)   Articles of Incorporation for Sabbah Brothers Enterprises, Inc. dated March 6, 2000. (Ex. 65)
b)   Minutes, Director's Meeting, Sabbah Brothers Enterprises, Inc. dated January 1, 2007. (Ex. 66)
c)   Share Certificate, Nineteenth Street Investments, Inc. dated February 3, 2007. (Ex. 67)
d)   Certificate of Share Ownership, Nineteenth Street Investments, Inc. dated February 3, 2007. (Ex. 68)
e)   Nineteenth Street Investments, Inc. Directors Resolution dated February 3, 2007. (Ex. 68)
f)   Corporate Name Resolution for Nineteenth Street Investments, Inc. dated December 30, 2003. (Ex. 69)
g)   Articles of Incorporation for Nineteenth Street Investments, Inc. dated January 7, 2004. (Ex. 70)
h)   Share Certificate for Nineteenth Street Investments, Inc. dated January 7, 2004. (Ex. 71-72)
i)   Resignation by Officer dated February 1, 2007. (Ex. 73)
j)   Nineteenth Street Investments, Inc. Director's Resolution dated February 3, 2007. (Ex. 74)
k)   Director's Resolution dated February 3, 2007. (Ex. 75)
l)   Nineteenth Street Investments, Inc. Change of Registered Agent form dated April 1, 2009. (Ex. 76)

The Court notes that the majority of these documents were created in connection with a single event - - the purported February 2007 Nineteenth share transfer from Yousef/Nasser to SBE. The Court has already found this transaction to be specious, since the actual transfer occurred in 2005. At any rate, the Court notes that the totality of the corporate documents is woefully inadequate considering the length of time the two corporations were in operation and the substantial business operations of both.

6.    There was substantial commingling of assets and bank accounts between and among Nineteenth, SBE, and Mr. Sabbah, as well as between these defendants and other corporations owned or controlled by Mr. Sabbah.

7.    There were numerous checks drawn on SBE accounts that paid obligations owed by Nineteenth.

8.    There were numerous checks drawn on Nineteenth accounts that paid obligations owed by SBE.

9.    There were numerous direct withdrawals from SBE accounts which paid Nineteenth's fuel supplier, Holmes Oil Company.  Nineteenth, in turn, claimed the cost of the fuel as an expense on its tax returns.

10.    There is no evidence that any of Nineteenth's obligations to Holmes Oil Company for fuel purchases were ever paid out of any Nineteenth account.  Instead, it appears that all such obligations were paid out of SBE accounts.

11.    There are numerous occasions where Mr. Sabbah's personal accounts and funds were used to pay obligations of Nineteenth and SBE, as well as other Sabbah-controlled corporations.

12.    There are numerous cash transfers to Nineteenth's accounts from SBE accounts.

13.    There are numerous cash transfers to SBE's accounts from Nineteenth's account.

14.    There are numerous cash transfers to SBE accounts and to Nineteenth's account from Mr. Sabbah's personal account.

15.    There are numerous cash withdrawals from SBE and Nineteenth accounts that appear to have been made by Mr. Sabbah, for which there is no accounting made.

16.     There are numerous transfers to Mr. Sabbah's personal account from both Nineteenth and SBE accounts, as well as from other corporate accounts.

17.     There are numerous transfers from accounts of other Sabbah-controlled corporations to the accounts held by SBE, Nineteenth, and Mr. Sabbah.

18.     There were no regular accountings made of such cash withdrawals or transfers to and from Mr. Sabbah's corporate and personal accounts and no controls were in place to ensure that proper accounting were done for the various companies.

19.     There were numerous incidents of SBE accounts being used to pay for convenience store inventory, including cigarettes, alcoholic beverages, and other items, even after December 31, 2006 - - a time when SBE was no longer operating any convenience store.  Some of these payments were clearly for inventory to be sold at Nineteenth Street.  No accounting was made for these purchases.

### 4.     No Accounting Controls or Reconciliation for Transfers.

Defendants' main argument was that these are all legitimate transactions and that they eventually properly accounted for these transactions within the proper corporate account. The Court rejects such a factual finding because there was a complete lack of evidence of accounting controls or reconciliation for the transfers between the corporations and Mr. Sabbah.  The evidence that no such accounting was done is also overwhelming and includes (but is not limited to) the following:

Mr. Sabbah testified that he did not prepare a general ledger or do any other accounting for the corporations, but relied on his bookkeeper, Barbara Jones, to do these tasks.  However, Jones denied that she (a) kept a general ledger for any corporate income and expenses; (b) balanced checkbooks or reconciled check ledgers for the corporations; (c) tracked cash transfers between the corporations or between Sabbah and the corporations; (d) allocated or accounted for expenses from

one corporation to the other; (e) reconciled suppliers' invoices to payments made from the corporations; (f) calculated or confirmed shareholder or inter-company loans; or (g) made any accounting for the cash transfers or withdrawals from the various corporate accounts.[8]

### 5.    Commingling of Mandatory Liquor Liability Controls.

The Court finds that perhaps the most convincing evidence of intermingling to be the means by which Defendants complied with governmental regulations concerning licensing for the sale of alcohol. This evidence includes (but is not limited to) the following:

1.    Jones testified that she would fill out liquor license renewals for Mr. Sabbah's businesses and that she would rely on Mr. Sabbah to provide her information on liquor liability insurance coverage.

2.    In 2004, SBE obtained an insurance policy for the building located at 600 14th Street. That policy included liquor liability coverage.

3.    When Nineteenth applied for its ABC license, it presented SBE's policy to the ABC Board in order to qualify for its license.

4.    Each time Nineteenth renewed its ABC liquor license, it represented to the ABC Board that it was insured under the SBE policy.

5.    At the time of the May 2, 2007, collision, Nineteenth was operating under an ABC license obtained and maintained by submission of SBE's liquor liability coverage.

6.    Both SBE and Nineteenth paid for premiums under this policy at various times.

---

[8] Defendants argued at trial that there had been proper accountings and that Plaintiffs did not properly consider or tally cash register receipts. Defendants maintained that Sabbah did, in fact, tally such receipts. As noted, there is no credible evidence that such accounting took place and no credible evidence that such register receipts were maintained or considered. As discussed elsewhere, the Court does not find Sabbah's testimony in this regard to be credible.

### 6.    Nineteenth Was Undercapitalized.

Plaintiffs offered the testimony of J. Lester Alexander, a forensic accountant and fraud examiner. He testified that the business affairs of Nineteenth were so intertwined with those of SBE and Mr. Sabbah that they could not be readily separated. In addition, he found that there was substantial indicia of fraud in the operation of Nineteenth, that Nineteenth did not follow regular corporate formalities, and that there was significant commingling of assets and incidents where one corporation would pay the debts and obligations of the other. He also found that Nineteenth was undercapitalized. Alexander's conclusions were not general, but were supported by specific facts, including (but not limited to) the following:

1.    Nineteenth's 2006 income tax returns reported income that was generated by other companies controlled by Mr. Sabbah. For example, Nineteenth reported $1.3 million in revenue in its 2006 federal tax return. However, only $500,000 in revenue deposits was evident in Nineteenth's banking statements. An additional $300,000 in transfers from other corporate accounts (including SBE and other accounts controlled by Sabbah) were made to the Nineteenth account, for a total of $800,000 in revenue. Accordingly, there is a shortfall of approximately $500,000, which demonstrates that Nineteenth's reported income was being supported by revenues generated by other companies controlled by Mr. Sabbah.

2.    The banking statements demonstrate that Nineteenth was insolvent and was losing money. Without the transfers into its account from other Sabbah-controlled corporate accounts, Nineteenth was completely insolvent. For example, in the 12-month period between June 2006 and May 2007, over $129,000 worth of checks would not have cleared without deposits from other, related corporations. In other words, Nineteenth spent at least $129,000 more than it collected, and absent transfers from other related businesses, it was insolvent.

3.      There was substantial and regular commingling of monies in the accounts of the various corporations. The Court has had the opportunity to review the banking records submitted into evidence. There are multiple transfers in and out of all Sabbah-controlled accounts to the Nineteenth account, which occurred on a regular basis. Alexander's examination documented 153 separate transfers between the various companies, totaling $349,138.00, in the 5-month period between January 1, 2007 and May 2, 2007. At the same time, there was no evidence of any loan, debt instrument, note, dividend, memorandum, or other accounting for the transfers back and forth between the companies.

4.      There was substantial evidence of one company's bills and obligations being paid for by another company. In the period of January 2007 through May 2, 2007, SBE's accounts paid Holmes Oil Company a total of $282,690.00 for fuel that was delivered to the Nineteenth convenience store and was sold by that entity. Nineteenth subsequently claimed the cost of those goods sold as an expense on its tax returns.

5.      In that same time frame, SBE's accounts were used to purchase inventory from Sam's Club, including cigarettes for sale in Nineteenth's 14th Street BP convenience store. Alexander totaled $118,300 of purchases at Sam's Club during this time frame. Additionally there is evidence that SBE's accounts were used for the purchase of alcohol from alcoholic beverage wholesalers during this same time frame. It is significant to this Court that it is undisputed that after December 31, 2006, the SBE corporation was not operating any convenience store. Yet, the evidence is substantial and overwhelming that in 2007 SBE's funds were being used to purchase convenience store inventory, including gasoline, cigarettes, and alcohol. These goods were eventually sold in the 14th Street BP convenience store.

-14-

6.      Alexander calculated that between July 26, 2005, through May 2, 2007 (the date of the collision) there were at least thirty-four instances of substantial cash withdrawals being made from these accounts, with no indication as to what those funds were used for or where the money went. A total of $232,114.00 was withdrawn. There is no evidence that any accounting was made for these withdrawals.

Based on this evidence, the Court finds that Nineteenth was undercapitalized, particularly given the risks of the business that it was operating. At the time of the illegal alcohol sale proven in this action, the financial responsibility regulations of the ABC Board required that each licensee maintain a minimum net worth of $100,000.00 (or maintain liquor liability insurance in at least that amount). Without the financial support of SBE, Nineteenth was completely insolvent. Given that the State of Alabama finds that the minimum capitalization for such businesses is $100,000,[9] then Nineteenth was not only undercapitalized, it was grossly undercapitalized.

7.      **Fraud In Operation.**

The Court also finds that Mr. Sabbah and SBE operated Nineteenth in a fraudulent manner. Although fraudulent operation is not always a requirement in a veil-piercing analysis, it is a factor to be considered. As shown by the evidence outlined above and below, SBE and Mr. Sabbah misused their domination of Nineteenth and asserted the purported separate corporate existence of Nineteenth Street for fraudulent purposes. This conclusion is based on the foregoing evidence and the following:

1.      Nineteenth first obtained and later renewed its ABC license by representing to the ABC Board that it had liquor liability insurance through a policy that had, in fact, been issued to

---

[9] Although the Court precluded Mr. Alexander from testifying as to this statutory and regulatory minimum, the Court can and does take judicial notice of the financial responsibility regulations in place for ABC licensees in 2006-2007. *See,* Ala. Admin. Code § 20-X-5-.14 (This administrative code has been subsequently amended).

SBE. When the policy renewed for the 2006 through 2007 time frame, Mr. Sabbah had ownership and control of both corporations. Mr. Sabbah had significant experience in the operation of convenience stores and knew the requirements of both insurance and ABC licensing, and knew that Nineteenth needed liquor liability insurance in order to operate. The fact that SBE's policy was represented to the ABC as Nineteenth's is further evidence to the Court that Sabbah considered and treated Nineteenth and SBE as a single corporation. Simply put, treating the corporations as the same in one circumstance (becoming insured and thus qualifying for an alcoholic beverage sales license) and then insisting the corporations are separate in a second circumstance (after a suit over illegal liquor sales is filed in order to shield assets or avoid payment) is precisely the type of fraudulent conduct and misuse of control that should prompt a court to disregard the corporation fiction.

2.      The overwhelming evidence of multiple transfers of funds between and among the defendants and the evidence of one defendant paying the financial obligation of the other is also evidence of misuse of the corporation fiction. Simply put, when Corporation A controls and makes use of Corporation B's funds as if they belonged to Corporation A, that act is fraudulent as to all potential creditors or tort claimants of either corporation. Such transfers, of necessity, improperly prop up an under-capitalized entity, while siphoning funds away from another entity. When such misuse of control exists, the fiction of separate entities should not be maintained.

8.      **Mr. Sabbah's Testimony Was Not Credible.**

In addition to all of the foregoing evidence, the Court finds Mr. Sabbah's testimony to not be credible for the following reasons:

1.      Mr. Sabbah claims that he did not own or control Nineteenth prior to February 3, 2007. Tax returns indicate his ownership prior to that time. Internal memoranda and

documents describe him as the "owner" of Nineteenth during calendar years 2005 and 2006. Most significantly, Mr. Sabbah himself opened a checking account at BBVA/Compass for Nineteenth in May 2005. He identified himself on the signature card as Nineteenth's "owner." After the account was opened, he began making transfers to and from that bank account to accounts of other corporations owned and controlled by him, including transfers to and from his personal accounts. Prior to his testimony in this case, Mr. Sabbah had testified that he had owned and operated Nineteenth since 2004.

2.      The Court observed many instances of Mr. Sabbah contradicting himself in his testimony or testifying completely contrary to prior testimony. For example, Mr. Sabbah testified at deposition that he had never worked for Nineteenth's previous owner, Mr. YousefNasser. Mr. Sabbah also testified in deposition that he had no financial control over Nineteenth, and never had any affiliation with Nineteenth Street, or its business operations, until after February 3, 2007. At trial, however, Sabbah testified that he did, in fact, work for Mr. YousefNasser as an "employee" prior to February 2007. This testimony was completely contradictory to Sabbah's deposition testimony and to the other testimony and evidence.

3.      As previously set out, the documentary evidence was replete with examples of Sabbah's complete control of Nineteenth Street in 2005 and 2006. Ms. Jones (who was an independent third party witness) confirmed that Sabbah was the "owner" of Nineteenth in 2005 and that he controlled its operations in 2005 and 2006.

4.      Sabbah also testified that a May 29, 2007, $85,000 cash withdrawal from the Nineteenth Street checking account was used to pay off a loan that Nineteenth Street had taken out at Renasant Bank. Sabbah, under specific questioning by this Court, testified that the loan was made to Nineteenth and not to SBE or to himself personally. The Court has had the opportunity to review

loan records subpoenaed from Renasant Bank and found the following: (1) Nineteenth had no loan outstanding with Renasant Bank in 2007; (2) SBE did have a loan outstanding with Renasant Bank in 2007; and (3) no payment of $85,000 was ever recorded (in May 2007 or any other time) by Renasant Bank on the SBE loan payment documents.[10]

5.      The Court had the opportunity to observe the mannerisms, behavior, and demeanor of Mr. Sabbah during his testimony, both in the jury trial and the non-jury proceeding. He appeared evasive and his answers were not forthcoming in a proper manner. The Court rejects any argument that Mr. Sabbah's conduct was related to language or communication problems. Mr. Sabbah has a bachelor's degree from Jacksonville State University in Business and Management. He studied accounting. He has lived in this country many years and has successfully operated numerous businesses. The Court did not find his protestations of being "confused" by simple and direct questioning to be credible.

### 9.      Mr. Hirsch's Testimony Was Not Convincing.

Defense Expert Hirsch offered three opinions. The Court was not persuaded by these opinions for the following reasons.

Mr. Hirsch's first opinion is that Nineteenth and SBE were separate entities because he found evidence of separate bank accounts, separate tax filings, separate W-2s, separate licenses, and separate corporate documents. Although the Court agrees that these documents exist, it does not explain or excuse the many irregularities evident in the documents and testimony. First, as noted, although there are separate bank accounts, there are so many numerous and fluid transactions among and between them (without accounting or reconciliation) so as to make that "separateness"

---

[10] Even assuming that Sabbah testified truthfully, it would result in more evidence of Nineteenth's funds being used to pay obligations for SBE. That fact would support the Plaintiffs' claims and would be additional evidence that Sabbah operated both businesses as a single enterprise.

meaningless.  The separate tax filings are much the same.  There is evidence that the tax returns themselves do not reflect the actual income and expenses of the Nineteenth due to the substantial commingling of funds and the payments of obligations by one corporation of the other.  Again, although the tax returns exist, they do not demonstrate that the corporations were kept substantially separate so as to maintain an independent identity.  As to the payroll tax and sales tax returns, there is evidence that the bank accounts of various entities were used to pay the tax obligations of others, which is itself evidence that would tend to support the Plaintiffs' claims.  Finally, although separate corporate documents exist (principally separate articles of incorporation), the corporate documents on the whole are woefully inadequate.  There are no records of regularly-kept director's or shareholder's meetings. In making a pierce-the-veil determination, it is expected that there will be at least some superficial evidence of separate corporate entities.  The question is whether that separateness will hold up in the face of other evidence.  Here, it does not.  The Court notes that Hirsch testified that he did not make any inquiry into whether factors might be present to make an alter-ego analysis, and frankly admitted that he was not familiar with the IRS factors which would cause the IRS to disregard a corporate entity.[11]  Finally, the Court notes that Mr. Hirsch, in his deposition testimony, admitted that he did not know what factors might be used to determine whether a court should disregard a corporate entity.

Mr. Hirsch's second opinion was that he found no evidence of fraud in the company's operation.  Mr. Hirsch based this opinion on his finding that, compared to statistics for the convenience store industry as a whole, Nineteenth operated at a higher profit and lower cost of goods sold than the average.  The court does not find this argument convincing.  It is entirely possible, even

---

[11]  These factors were entered into evidence in the form of Published IRS Manuals (Exhibits 99, 100.)  The Court notes that they are indistinguishable from the factors that are outlined in Alabama case law.

probable, that a fraudulently-operated convenience store corporation would be more profitable than other convenience stores. The mere profitability of a company does not demonstrate honest operation.

Mr. Hirsch's final opinion was that Nineteenth had engaged in proper accounting based on what is normal within the industry and on his assumption that register tape receipts were properly tallied and accounted for by Sabbah, or by someone in Sabbah's employ. This testimony ignores the fact that Sabbah's bookkeeper denied doing any such tally or accounting. Likewise, Sabbah (in his deposition) denied that anyone other than the bookkeeper had made any such accounting. Mr. Hirsch's testimony is based on an assumption that an accounting of the register tapes would agree with the accounting that appears on the tax returns. That assumption, in turn, is based upon a reliance on Mr. Sabbah's declaration and assurance that it is so. As previously noted, this Court did not find Mr. Sabbah to be a credible or authoritative witness. The Court finds that reliance on Mr. Sabbah is misplaced and that Mr. Hirsch's testimony in this regard is also unconvincing.

**D.      The Controlling Law.**

"In Alabama ... it is basic that a corporation is a distinct and separate entity from the individuals who compose it as stockholders or who manage it as directors or officers."[12] "[T]he limitation of personal liability is a valid corporate attribute;" however, Alabama law also recognizes that corporate formalities may be "discarded to prevent injustice or inequitable consequences."[13] Alabama courts "[have] not been hesitant to disregard the corporate form" in proper situations.[14]

---

[12] Cohen v. Williams, 318 So. 2d 279, 281 (Ala. 1974)(*citing* Looper v. Gill, 213 So.2d 674 (Ala. 1968)).

[13] Messick v. Moring, 514 So. 2d 893, 894 (Ala. 1987)(*citing* Bon Secour v. Barrentine, 408 So. 2d 490 (Ala. 1981)); Dupree v. Anderson, 505 So. 2d 1218, 1222 (Ala. 1987)("[a] corporation and the individual or individuals owning all of its stock may be treated as identical, even in the absence of fraud to prevent injustice or inequitable consequences.").

[14] Hill v. Fairfield Nursing, 2013 WL 3242867, *8 (Ala. 2013)(*citing* C.E. Dev. Co. v. Kitchens, 264 So. 510 (Ala. 1972)); Messick, 514 So. 2d at 894 ([i]n certain situations the corporate entity will be disregarded and

Although the "corporate form is not lightly disregarded," the question of "[w]hether the separate legal entity of a corporation may be 'pierced' ... is a question of fact treated as an evidentiary matter to be determined on a case by case basis."[15] The Supreme Court of Alabama has recently stated that the courts "should not allow a corporate entity to successful masquerade through its corporate affiliates so as to defeat the payment of its just obligations."[16] The court further noted that "[t]he law will not recognize the legal entity of a corporation in equity when the controlling shareholder or officer creates a corporation 'to promote injustice and protect the owner from payment of just obligations.'"[17] Courts will disregard the corporate entity "when it is used solely to avoid personal liability of the owner while reserving to the owner the benefits gained through the use of the corporate name."[18]

The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for purposes of convenience and to serve the ends of justice. The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive to its policy, will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all of its stock and assets will be treated as identical.[19]

Alabama law recognizes that "when the corporate form is being used to evade personal responsibility, the corporate form will be disregarded and liability will be imposed on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a

---

limited stockholder liability will be denied.).

[15] Hill, 2013 WL 32428967 at *9 (*citing* Messick, 514 So. 2d at 893).

[16] Hill, 2013 WL 2342867 at *12 (*citing* Forest Hill v. Latter & Blum, 29 So. 2d 298, 302 (Ala. 1947)).

[17] Hill, 2013 WL 3242867 at *9 (*citing* Tri-State Bldg. v. Moore-Handley Inc., 333 So. 2d 840, 841 (Ala. Civ. App. 1976)).

[18] Bon Secour, *supra* at 491.

[19] Hill, 2013 WL 3242867, at *8 (*citing* Cohen, 318 So. 2d at 280-281).

manner to make it his mere instrumentality." This may be done in the proper case "when the corporate form is being used to evade personal responsibility."[20] Additionally, a court may "pierce the corporate veil" and declare a stock holder or officer the corporation's alter ego when evidence is presented that the stock holder or officer used the corporate form to escape liability."[21]

The Alabama cases have not always been consistent in the ways in which they analyze these issues, or in the terms used to discuss them.[22] However, Alabama law recognizes at least four ways that the corporate veil may be equitably pierced: (1) inadequacy of capital; (2) fraudulent purpose in conception or operation of the business; (3) operation of the corporation as an instrumentality; and (4) operation of the subsidiary as an alter ego of the parent.[23] As can be seen, proof of fraud is only one of the avenues to attach liability. Indeed, the Supreme Court of Alabama has made clear that "[a]ctual fraud is not necessarily a predicate for inequitable consequences."[24] To the contrary, the "theory of separate corporate existence can be properly discarded, even in absence of fraud or illegality, to prevent injustice or inequitable consequences."[25]

The latter two avenues are the ones most often used. When a parent company owns all of the stock of a subsidiary, the parent may be liable for the acts of the subsidiary when "the parent corporation so controls the operations of the subsidiary as to make it a mere adjunct, instrumentality, or an alter ego of the parent corporation."[26] Although it is "manifestly impossible to catalogue the infinite variations of fact that can arise," there are certain common circumstances which are

[20] Hill, *supra* (*citing* C.E. Dev., *supra*), Messick, 514 So. 2d at 894 (*citing* Cohen, *supra*).

[21] Hill, 2013 WL 3242867, at *9 (*citing* Alorna Coat v. Behr, 408 So. 2d 496, 498 (Ala. 1981).

[22] See, e.g., Grisham, S.J., *Piercing the Corporate Veil in Alabama: In Search of a Standard*, 35 Ala. L. Rev. 311 (1984)(cited with approval, Hill, 2013 WL 3242867 at *13 (Murdock concurring).

[23] Messick, 514 So. 2d at 894.

[24] Hill, 2013 WL 3242867 at *10; Cohen, 318 So. 2d at 281.

[25] Messick, 514 So. 2d at 894; Forest Hill, 29 So. 2d at 302 ("[t]he courts will not apply the doctrine [of separate corporate existence] when to do so would extend the principle beyond its legitimate purposes and produce injustices and inequitable consequences").

important and controlling, if present in the proper combination.[27] The well-established <u>Duff</u> indicia of control are: (a) the owner owns all of most of the capital stock of the subsidiary; (b) the owner and owned companies have common directors or officers; (c) the owner company finances the subsidiary; (d) the owner company subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation; (e) the subsidiary has grossly inadequate capital; (f) the owner company pays the salaries and other expenses or losses of the subsidiary; (g) the subsidiary has substantially no business except with the parent or no assets except those conveyed to it by the parent corporation; (h) in the papers of the parent or in the statements of its officers, the subsidiary is described as a department or division of the parent, or its business or financial responsibility is referred to as the corporation's own; (i) the parent uses the property of the subsidiary as its own; (j) the directors or executives of the subsidiary do not act independently of the interest of the subsidiary but take their orders from the parent in the latter's interest.[28]

This list of factors is not dispositive; nor is it an exhaustive list of relevant factors. Other evidence on the issue of control may be presented.[29]  Indeed, the Alabama courts have allowed piercing of the corporate veil when only a few of these factors were present.[30]  As noted, what constitutes the elements of "mere instrumentality" will differ from case to case.  "[A] parent corporation will be responsible for the obligations of its subsidiary when its control has been

---

[26] <u>Hill</u>, 2013 WL 3242867, at *9 (*citing* <u>Baker v. Hosp. Corp.</u>, 432 So. 2d 1281 (Ala. 1983)).
[27] <u>Duff v. Southern Ry.</u>, 496 So. 2d 760, 763 (Ala. 1986).
[28] <u>Hill</u>, 2013 WL 3242867 at **9-10; <u>Duff</u>, 496 So.2d at 763 (*citing* <u>Taylor v. Standard Gas</u>, 96 F.2d 693, 704-705 (10th Cir. 1938)).
[29] <u>Duff</u>, 496 So. 2d at 763 ("there was evidence of other relevant factors on the issue of control").
[30] <u>Hill</u>, 2013 WL 3242867 at *10; <u>Duff</u>, 496 So. 2d at 763 (precluding summary judgment when four or five of the listed factors were present along with other relevant evidence of control).

exercised to such a degree that the subsidiary has become a mere instrumentality."[31] The essential

elements for imposition of liability for "mere instrumentality" are as follows:

(1)   The dominant party must have complete control and domination of the subservient corporation's finances, policy, and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;

(2)   The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed;

(3)   The misuse of control must proximately cause the harm or unjust loss complained of.[32]

However, it is not necessary that the conduct of an "alter-ego" (as opposed to "instrumentality")

contribute to proximately cause the plaintiff's injuries.  As explained by a widely-used Alabama

treatise:

One of the principal doctrines cited for disregarding a corporate entity is the "agency" or respondeat superior theory.  Under this theory, the corporation is deemed to have acted pursuant to the *control* of its shareholders or principal shareholder so that, as with the agency concept of respondeat superior, it is appropriate to impose on the shareholder liability for the corporation's actions.  Though courts characterize this theory differently, some referring to it as a theory of corporate "instrumentality," some as a theory of corporation as the shareholder's "alter ego," and some as a theory based on failed corporate "formalities," there are differences, at times recognizable from the Alabama cases, in the three approaches.  Under an "instrumentality" approach, for example, the emphasis tends to be on actions which are purportedly taken in behalf of the corporation, but which are effected by the shareholder as in an individual capacity.  Thus, the corporate entity is considered a mere means to an end, rather than itself the initiating and responsible party.  Under this approach, courts may, in contrast to other grounds of agency, search for a clear, causative link between the allegedly injurious acts of the corporation and the action of the shareholder.  Alabama courts over the years have invoked the "instrumentality" terminology in cases finding the corporation to be, in fact, an agent of the underlying shareholders, but without always drawing a distinction between other grounds for determining that agency exists.  In contrast, *the "alter ego" approach* to agency places emphasis on

---

[31]  <u>Duff</u>, 496 So. 2d at 762 (emphasis added).

[32]  <u>Messick</u>, 514 So. 2d at 894-895 (*citing* <u>Lowendahl v. Baltimore & Ohio Ry.</u>, 287 N.Y.S. 62 (1936)).

the *status* and/or *organizational similarities* of the corporation on the one hand and the shareholder on the other. In the case of a corporation with a subsidiary unit, for example, a court may look with skepticism on the fact that the two entities have the same directors, same officers, same registered agents, bank accounts, and meeting dates, and conclude that the subsidiary is no more than an "alter ego" of the underlying corporate shareholder. The same analysis can be applied where the underlying shareholder is an individual business person. Alabama courts tend to say that the "alter ego" doctrine is the principal approach for finding liability under an agency concept in Alabama, though, as indicated, decisions are not consistent from an analytical standpoint in distinguishing the circumstance when the corporation serves as an instrumentality of shareholder will, as construed to being, in fact, an "alter ego" to the underlying shareholder." A principal distinction that can be made is that, *__unlike__* the instrumentality approach, a causative link between actions of the shareholder and the corporation *would __not__ seem essential* under an "alter ego" approach.[33]

The Court finds, however, that in this particular case, Nineteenth's veil can be pierced and, indeed, should be pierced under any of the various theories recognized by our courts: (a) Nineteenth is undercapitalized; (b) there is fraudulent purpose in the conception and conduct of its business; (c) Nineteenth is operated as a instrumentality of both SBE and Sabbah; and (d) Nineteenth operated as the alter-ego of both SBE and Sabbah.

E.      Conclusions of Law.

Applying the above law to the facts in this case, the Court uses its equitable powers to bind Mr. Sabbah and SBE to the judgments against Nineteenth. The Court's conclusions of law are as follows:

1.      Nineteenth was inadequately capitalized and was basically insolvent. This fact is particularly troubling when the Court considers that State law required that the company be capitalized with a minimum of $100,000 of net worth or to have at least $100,000 in liquor liability insurance. Given these minimums required for a company to engage in the business risks of the sale of alcohol, Nineteenth Street was clearly undercapitalized.

---

[33] Thigpen, Ala. Practice Series: Ala. Corp. Law, ' 8:3, pp. 434-436 (Thompson 3rd Ed.)(citations omtd).

2.      Nineteenth was operated fraudulently and Sabbah misused his control over Nineteenth and SBE. In order to obtain its liquor license, Nineteenth represented to the State of Alabama that it was covered under an adequate liquor liability policy. In fact, the liquor liability policy was issued in the name of Sabbah Brothers Enterprises, Inc. Without this representation, Nineteenth would not have been able to obtain a liquor license. As shown by the evidence outlined above, SBE and Sabbah misused their domination of Nineteenth Street and asserted the purported separate corporate existence of Nineteenth Street for fraudulent purposes.

3.      SBE and Mr. Sabbah operated Nineteenth as their instrumentality and as their alter-ego and further misused their control because: (1) Sabbah owned and controlled the capital stock and the operations of both companies; (2) The companies had common officers and directors; (3) SBE's funds were used to support Nineteenth; (4) Nineteenth was inadequately capitalized; (5) SBE used Nineteenth's assets as its own; (6) The Defendants herein have failed to adhere to the legal requirements and formalities of corporate form and governance; (7) The assets of the Defendants have been commingled without proper accounting; (8) SBE regularly paid Nineteenth's loans and obligations out of its accounts; (9) Numerous transfers of cash and funds were made between Defendants with no accounting; (10) Mr. Sabbah controlled the operations of both SBE and Nineteenth for his own individual benefit; (11) Defendants failed to maintain adequate corporate books and records; and (12) All of the other reasons and conclusions above.

4.      There was direct loss to Plaintiffs due to corporate fraud and misconduct. Nineteenth was inadequately capitalized and the businesses were set up so that all of the risk of the sale of alcohol fell on Nineteenth. The Plaintiffs were harmed and suffered grievous losses as a result of illegal sales of alcohol, for which Nineteenth was inadequately capitalized and underinsured. The end result is that Nineteenth is simply a shell corporation, and one in which all of the benefits and

profits had been drained to the benefit of its owners.  This has resulted in substantial injustice to the Plaintiffs.

The Alabama appellate courts have made it clear that corporate entities may be disregarded under a variety of circumstances.  "[W]here a corporation is set up as a subterfuge, where shareholders do not observe the corporate form, where the legal requirements of corporate law are not complied with, where the corporation maintains no corporate records, where the corporation maintains no corporate bank account, where the corporation has no employees, where the corporate and personal funds are intermingled and corporate funds are used for personal purposes, *or* where an individual drains funds from the corporation."[34]  The Court finds that substantially all of the various factors to be considered (as well as the other factors discussed above) are present in this case.  Accordingly, the theory and legal fiction of the separate corporate existence of Nineteenth and SBE is to be disregarded, and the Court finds them to be one and the same. Likewise, the Court finds that Mr. Sabbah is the alter-ego of each corporation, and that the corporate veil should be pierced through to him as well.  To rule otherwise would be to allow an unjust or inequitable consequence to occur and would extend the corporate fiction beyond its legitimate purposes.

## IV.    Final Judgment of All Claims Amongst All Remaining Parties.

It is ORDERED, ADJUDGED, AND DECREED that the separate corporate existence of Defendant The Nineteenth Street Investments, Inc., in all of the above-styled cases is disregarded and Defendants Ibrahim Sabbah and Sabbah Brothers Enterprises, Inc., are liable for any judgment rendered against Defendant The Nineteenth Street Investments, Inc., upon the jury's verdict as set-forth above.

---

[34] *Econ Marketing v. Leisure Am.*, 664 So. 2d 869, 870 (Ala. 1994)(emphasis added).

It is further ORDERED, ADJUDGED, AND DECREED that the separate corporate existence of Defendant Sabbah Brothers Enterprises, Inc., in all of the above-styled cases is disregarded and Defendant Ibrahim Sabbah is liable for any judgment rendered against Defendant Sabbah Brothers Enterprises, Inc., as set-forth above.

It is further ORDERED, ADJUDGED, and DECREED in Case Number 68-CV-2007-633 that FINAL JUDGMENT is rendered in favor of Plaintiff Sharon Robertson and against Defendants The Nineteenth Street Investments, Inc., Sabbah Brothers Enterprises, Inc., and Ibrahim S. Sabbah, jointly and severally, in the amount of $7,000,000.00 (Seven Million and 00/100 Dollars).

It is further ORDERED, ADJUDGED, and DECREED in Case Number 68-CV-2007-783 that FINAL JUDGMENT is rendered in favor of Plaintiff Jennifer Vickery and against Defendants The Nineteenth Street Investments, Inc., Sabbah Brothers Enterprises, Inc., and Ibrahim S. Sabbah, jointly and severally, in the amount of $3,900,000.00 (Three Million Nine-Hundred Thousand and 00/100 Dollars).

It is further ORDERED, ADJUDGED, and DECREED in Case Number 68-CV-2007-797 that FINAL JUDGMENT is rendered in favor of Plaintiff Michael Waldrop and against Defendants The Nineteenth Street Investments, Inc., Sabbah Brothers Enterprises, Inc., and Ibrahim S. Sabbah, jointly and severally, in the amount of $3,750,000.00 (Three Million Seven Hundred Fifty Thousand and 00/100 Dollars).

It is further ORDERED, ADJUDGED, and DECREED in Case Number 68-CV-2007-633 FINAL JUDGMENT is rendered in favor of Plaintiff Tammy Hardin and against Defendants The Nineteenth Street Investments, Inc., Sabbah Brothers Enterprises, Inc., and Ibrahim S. Sabbah, jointly and severally, in the amount of $500,000.00 (Five Hundred Thousand and 00/100 Dollars).

Any post-judgment interest may accrue as provided by law.  Costs are taxed against Defendants. This is intended to be a final judgment that adjudicates all claims in these actions. To the extent there are any claims or parties not specifically adjudicated in this judgment, those claims and those parties are hereby dismissed with prejudice.

DONE and ORDERED on this the 20th day of December, 2013.

Eugene R. Verin, Circuit Judge