**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **IBRAHIM SABBAH, and SABBAH BROTHERS ENTERPRISES, INC,** doing business as 14th Street BP, | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) **Case No.: 2:15-CV-1772-VEH** |
| | ) |
| **NATIONWIDE MUTUAL INSURANCE COMPANY and NATIONWIDE MUTUAL FIRE INSURANCE COMPANY,** | ) ) ) ) ) |
| **Defendants.** | ) ) |

---

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

This is a civil action filed by the Plaintiffs, Ibrahim Sabbah ("Sabbah"), and

Sabbah Brothers Enterprises, Inc. d/b/a 14th Street BP ("SBE"), against the

Defendants, Nationwide Mutual Fire Insurance Company ("NMFIC") and Nationwide

Mutual Insurance Company ("NMIC"). (Doc. 47). The 113 page Second Amended

Complaint was filed on September 7, 2016. The following counts for relief are

alleged therein: negligent/wanton failure to settle by NMFIC (Count One);

negligent/wanton failure to settle by NMIC (Counts Two and Three); bad faith failure

to properly investigate, defend, and settle by NMFIC (Count Four); bad faith failure

to properly investigate, defend, and settle by NMIC (Counts Five and Six); bad faith failure to indemnify by NMFIC (Count Seven); bad faith failure to indemnify by NMIC (Counts Eight and Nine); breach of the enhanced duty and obligation of good faith by NMFIC (Count Ten); breach of the enhanced duty and obligation of good faith by NMIC (Count Eleven); breach of contract by NMFIC (Count Twelve); breach of contract by NMIC (Count Thirteen); declaratory judgment against NMFIC (Count Fourteen); and declaratory judgment against NMIC (Count Fifteen). All counts arise out of judgments obtained against Sabbah and SBE in four underlying lawsuits, and the instant Defendants' refusal to indemnify SBE and Sabbah as to those judgments.

The case comes before the Court on the Defendants' Motion To Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 50). For the reasons stated herein the Motion To Dismiss will be **GRANTED in part** and **DENIED in part**.

## II.    STANDARD

Generally, the Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). However, to survive a motion to dismiss brought under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*").

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556) ("*Iqbal*"). That is, the complaint must include enough facts "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation and footnote omitted). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertion[s]" without supporting factual allegations. *Id.* at 555, 557 (citation omitted).

Once a claim has been stated adequately, however, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563 (citation omitted). Further, when ruling on a motion to dismiss, a court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008) (citing *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006)).

## III. FACTUAL ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

The Second Amended Complaint contains the following factual allegations:

### A.     **The Insurance Policies**

7.     On or about April 5, 2007, **SBE** purchased and/or renewed a business owners liability insurance policy (Policy No. 77-BO-762-940-3001) (hereinafter the "NMIC Policy") issued by **NMIC**. (see Exhibit A[1]). On the same date, **SBE** purchased and/or renewed a commercial general liability insurance policy with liquor law liability coverage (Policy No. 77 PR 762-940-3007) (hereinafter the "NMFIC Policy") issued by **NMFIC**. (see Exhibit B[2]). The policy period for both policies was April 5, 2007 to April 5, 2008.

8.     The [NMIC] Policy listed **SABBAH BROTHERS ENTERPRISES INC**. as the named insured and the NMFIC Policy listed **SABBAH BROTHERS ENTERPRISES INC., d/b/a 14TH STREET BP** as the named insured. (Ex. A, p.1; Ex. B, p.1). Both policies describe **SBE**'s business as convenience store. The NMFIC Policy lists **14TH STREET BP** as the name of the covered convenience store and both policies list the covered address as "600 14th Street, Bessemer, Alabama, 35023."[3]

* * *

10.     The NMFIC Policy provided liquor liability coverage in the sum of $1,000,000 for each occurrence and $1,000,000 in the aggregate. The NMFIC Policy will pay for "bodily injury" caused by "the selling, serving or furnishing of any alcoholic beverage" at "**premises you own**,

---

[1] "Exhibit A" is document 47-1 in the Court's CM/ECF system. Attachments to a complaint are properly considered in ruling on a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (*citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) and *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999)).

[2] "Exhibit B" is document 47-2 in the Court's CM/ECF system.

[3] The Court has reviewed both policies and notes, for clarification, that the NMIC policy lists "600 14th Street, Bessemer, Alabama 3502<u>6</u>" as the address for the location of the covered business. (Doc. 47-1 at 2) (emphasis added). The NMFIC policy lists "600 14th Street, Bessemer, Alabama 3502<u>3</u>" as the "location of all premises you own, rent, or occupy." (Doc. 47-2 at 8) (emphasis added).

rent or occupy."[4]

11.     The NMIC Policy provided business owners liability coverage in the sum of $1,000,000 for each occurrence and $2,000,000 in the aggregate. The NMIC Policy will pay for "bodily injury" caused by "an occurrence" and "personal injury" caused by an offense arising out of your business, that takes place in the "coverage territory" and during the policy period. The NMIC Policy defines an occurrence as an accident, and the coverage territory as the United States.

12.     At all relevant times, the premises of the **14TH STREET BP** were owned by **SBE** and the store was operated pursuant to a lease between **SBE** (lessor) and Nineteenth Street[5] (lessee). **SBE** is a related entity to Nineteenth Street. **SABBAH** is employee, owner, sole shareholder, officer, and director of **SBE** and **SBE** is the sole shareholder of Nineteenth Street. **SABBAH** is also an officer and director of Nineteenth Street.

## B.     The Underlying Accident and Litigation

13.     On or about May 2, 2007, an automobile accident occurred in which three teens were severely and permanently injured and another died. Those teens alleged that the accident was caused by alcohol consumption and that the employee at the **14TH STREET BP** located at 600 14th Street, Bessemer had illegally sold alcohol to intoxicated minors.

14.     Through various pleadings and amendments, claims were brought against Nineteenth Street, **SBE**, **14TH STREET BP** and **SABBAH** by the injured parties in the following Alabama state court civil actions, in the Circuit Court for Jefferson County, Bessemer Division:

---

[4] The Second Amended Complaint notes that emphasis was added here.

[5] The legal name of this entity is "Nineteenth Street Investments."  It is referred to by the parties, and this Court, as "Nineteenth Street," and sometimes as "NSI."

(a) *Sharon Robertson, et al. v. Brittany Caffee, et al.*, 68-CV-2007-000633. (Plaintiff represented by Pat Lavette of Davenport Lavette and Cleckler)

(b) *Tammy Hardin, Mother of Brittany Caffee v. Nineteenth Street Investments*, CV-2007-000633. (Plaintiff represented by Don McKenna and Ashley Peinhardt of Hare Wynn Newell & Newton)

(c) *Susan Green, et al. [Jennifer Vickery] v. Brittany Caffee*, et al., CV-2007-000783. (Plaintiff represented by Ralph Bohanan of Bohanan and Associates)

(d) *Tisha Owens and Bobby Waldrop [Michael Waldrop] v. Brittany Caffee, et al.*, CV-2007-00797. (Plaintiff represented by Edward Tumlin, Esq.)

15.   The state court lawsuits alleged that Nineteenth Street, **SBE**, **14TH STREET BP**, and **SABBAH** were responsible for the deaths and injuries of the minors pursuant to Alabama's "Dram Shop" laws. The basic allegation by the "dram shop Plaintiffs" (hereinafter collectively referred to as the "Claimants") was that Nineteenth Street illegally sold alcoholic beverages to Brittany Caffee, a minor, from its "14th Street BP" convenience store in Bessemer, Alabama. Claimants alleged that Caffee became intoxicated as a consequence of these illegal sales and that she later crashed the vehicle she was driving, killing one passenger and injuring the others. Additionally, each of the lawsuits alleged that **SBE**, **14TH STREET BP**, and **SABBAH** were liable for any judgment rendered against Nineteenth on equitable veil-piercing and/or alter-ego grounds. Claimants made claims that **SABBAH** was "an officer, director, and shareholder" of **SBE**.

## C.   <u>The Claim Management, Handling, and Adjusting</u>

* * *

17.   SBE d/b/a **14TH STREET BP**, **SABBAH**, and Nineteenth Street

requested that **NMFIC** and **NMIC** provide it defense and indemnity for each of the above lawsuits under the terms of the Policies. . . .

18.     While **NMFIC** issued the NMFIC Policy to **SBE d/b/a 14TH STREET BP**, on information and belief, **NMFIC** and/or **NMIC** handled all aspects of managing, handling, and adjusting the claim. The correspondence regarding the claims were sent from employees of Nationwide on behalf of both **NMFIC** and **NMIC**. On information and belief, **NMFIC** is the alter-ego of **NMIC** in that **NMIC**, at all relevant times, exercised total dominion and control over **NMFIC** and **NMIC** voluntarily undertook the management, handling, and adjusting of claims against the NMFIC Policy. On information and belief, **NMIC** voluntarily undertook certain duties to be performed by **NMFIC** and **NMIC** acted on behalf of **NMFIC** to perform the services related to the management, handling, and adjusting of claims against the NMFIC Policy. Also, during the course of the underlying litigation, employees and agents of **NMFIC** acted on behalf of **NMIC** to perform the services related to the management, handling, and adjusting of claims against the NMIC Policy.

19.     During the course of the litigation, defense counsel on the underlying claims against **SBE**, **14TH STREET BP**, and **SABBAH** provided regular updates and correspondence to **NMFIC** and **NMIC**, including commercial claims specialist Kelly Jackson and Kevin Paschall. These letters were directed to "Nationwide Insurance Company" and not specifically **NMFIC** or **NMIC**, making it impossible to determine which company [was] responsible for managing, handling, and adjusting the claims. According to the Alabama Department of Insurance, there is no such corporate entity named "Nationwide Insurance Company." Upon information and belief, "Nationwide Insurance Company" is a conflation of **NMFIC** and **NMIC** intended to permit either entity to act on behalf of and/or as the alter-ego of the other in performing the services related to the management, handling, and adjusting of claims against each insurer's policies.

20.     On July 2, 2007, Kori Clement ("Clement") wrote to Kelly

Jackson[6] of "Nationwide Insurance Company" to "confirm and acknowledge [her] assignment of the defense of Sabbah Brothers Enterprises." (see Exhibit C[7]). The letter provided no other clarification of whether **NMFIC**, **NMIC**, or both entities was assigning the defense of the action. Likewise, the very same day, Clement sent a letter to **SBE** advising of her firm's retention and instructing him to not speak with anyone other than someone from her firm or "a representative of Nationwide Insurance Company." (see Exhibit D[8]). Despite [the fact that] they were paying her bill, based on the correspondence to and from Clement, it is clear that she made no distinction between the non-existent entity of "Nationwide Insurance Company" and **NMFIC** and/or **NMIC**.

21.   On July 17, 2007, Clement sent an initial case evaluation to Kelly Jackson of "Nationwide Insurance Company." (see Exhibit E[9]). Despite both **NMFIC** and **NMIC** issuing policies at issue, Kelly Jackson was not noted in this letter to be employed by either **NMFIC** or **NMIC**.

   [Clement . . . informed . . . Jackson . . . that a coverage defense trying to pin all of the liability on the non-named insured (Nineteenth Street) would not exculpate the named insureds. [sic] Counsel stated that we may "seek to avoid liability by arguing that [Nineteenth Street], rather than SBE, sold the beverages to Ms. Caffee. [Nineteenth Street] operated the 14th Street BP station and it held the liquor license to the property … [but] … even if we could prove that [Nineteenth Street], and not SBE, provided the liquor to Ms. Caffee, the plaintiff could arguably still hold SBE liable by showing that [Nineteenth Street] is basically merely the alter ego of SBE. Plaintiff could accomplish this by showing

---

[6] The Court notes that the letter refers to Jackson as a "Commercial Claims Specialist." (Doc. 47-3 at 2).

[7] "Exhibit C" is document 47-3 in ths Court's CM/ECF system.

[8] "Exhibit D" is document 47-4 in the Court's CM/ECF system. The Court notes that the letter was addressed to "Sabbah Brothers Enterprises, Inc. c/o Ibrahim Sabbah." (Doc. 47-4 at 2).

[9] "Exhibit E" is document 47-5 in the Court's CM/ECF system.

that SBE owns all of [Nineteenth Street]'s issued stock, which we understand it does. … Therefore, we believe it is unlikely that we will prevail by showing that [Nineteenth Street], and not SBE, dispensed the liquor, but we will pursue the facts regarding that argument." (see Exhibit E).[10]][11]

[On] July 19, 2007 - Kelly Jackson sent a letter to **SBE** and **SABBAH** on behalf of both **NMFIC** and **NMIC** denying coverage on the claims and offering a "courtesy defense" to **SBE** on behalf of those entities. (see Exhibit F[12]). . . .[13]

*   *   *

23.    On January 26, 2009, following several amendments by the Claimants to underlying complaints, Kevin Paschall[14] sent **SBE dba 14th Street BP**[15] a letter on behalf of **NMFIC** [stating] that [NMFIC]

---

[10] The Court has omitted the following argument from this paragraph:

This letter clearly warned NMFIC and NMIC about the clear risk to the insureds in 2007—eight years before final judgment was entered. Moreover, this letter clearly informed both NMIC and NMFIC that SBE could be liable as the alter-ego of Nineteenth, even if SBE was not the entity that sold the alcohol. Such liability is unquestionably covered under both the NMIC and NMFIC Policies.

[11] Bracketed material pulled from paragraph 28 of the Second Amended Complaint.

[12] "Exhibit F" is document 47-6 in the Court's CM/ECF system.

[13] The Court has excluded from its recitation of the pleaded facts the following conclusion: "Therefore, it is clear that both NMIC and NMFIC were participating in the defense of Plaintiffs." Similarly, the following has been omitted:

22.    The allegations, as contained in the "four corners" of the Claimants' complaints, clearly alleged covered claims by both policies against the named insured SBE and the clear definitional insured -- SABBAH.

[14] The Court notes that the letter identifies Pascall as from the "Claims Department" of "Nationwide Mutual Fire Insurance Company." (Doc. 47-7 at 2).

[15] The Court notes that the letter was sent to "Attn Ibrahim Sabbah." (Doc. 47-7 at 2).

was investigating the claim against **SBE** and indicated that "It is possible that the value of this claim will be more than the limits of your policy. Because of this possibility, you may want to consider consulting with an attorney at your own expense." (see Exhibit G[16]).

24.    On February 23, 2009, . . . **NMFIC** and **NMIC** sent a letter to **SABBAH** disclaiming coverage, but affording a "courtesy defense." (see Exhibit H[17]). The letter specifically disclaimed coverage under the NMIC Policy[18] because "no liquor liability coverage was purchased for this policy, there is no coverage for this claim."[19] . . .[20]

25.    On April 3, 2009, . . . **NMFIC**[21] sent **SBE** and **SABBAH**[22] a

---

[16] "Exhibit G" is document 47-7 in the Court's CM/ECF system.

[17] "Exhibit H" is document 47-8 in the Court's CM/ECF system.

[18] The Court notes that the letter referenced and discussed coverage under both policies at issue in this case, as well as others. It appears that the Plaintiffs are trying to convey that, in the portion of the letter discussing the NMIC policy the letter specifically disclaimed overage as to that policy, based on that fact that "no liquor liability coverage was purchased for [that] policy." (Doc. 47–8 at 3).

[19] The Court notes that the letter references the following "insureds": Sabbah Brothers Enterprises, Inc., Sabbah Brothers Enterptises, Inc. d/b/a Red Rock 2, Sabbah Brothers Enterprises, Inc. d/b/a Liberty Convenience Store, and Sabbah Brothers Enterprises, Inc. d/b/a 14th Street BP. (Doc. 47-8 at 2).

[20] The following argument was deleted from this paragraph by the Court: "This disclaimer of coverage was factually incorrect because the NMIC Policy only excluded coverage for liquor liability if SBE was 'in the business' of manufacturing, distributing, selling, serving or furnishing alcoholic beverages."

[21] The Court notes that the letter specifically stated that "Nationwide Mutual Fire Insurance Company ('Nationwide') has examined the claim made against you by the above-referenced claimant." (Doc. 47-9 at 1). It referenced as the "insured": Sabbah Brothers Enterprises Inc DBA: 14th Street BP. (Doc. 47-9 at 1). It also referenced both policies at issue in this case. *See* doc. 47-9 at 1 ("Nationwide has reviewed the relevant information, including the Nationwide policy numbers, 77 PR 762940-3007 and 77 BO 762940-3001 (the 'policies')").

[22] The Court notes that the letter was addressed to "Ibrahim Sabbah Sabbah Brothers Enterprises, Inc." (Doc. 47-9 at 1).

Reservation of Rights letter ("ROR"). (see Exhibit I[23]). The letter indicated that **NMFIC** examined both the NMFIC Policy and the **NMIC** business owner's policy. The letter noted that "the claim presented by this claimant may not be covered under the policies," and that whether coverage is provided will hinge on "issue[s] that will ultimately be determined by a court of law." (Emphasis added). . . .[24] The letter states:

> The coverage issues related to each cause of action against you include, but are not limited to:

> The business owner's liability coverage form excludes coverage for liquor liability, and the liquor liability coverage form excludes coverage when there is no liquor license in effect. **SBE** did not have a liquor license in effect when this loss occurred.

> The following excerpts from your coverage form will help to explain the coverage issues.

26.     Regarding the NMFIC Policy, **NMFIC** cites the following exclusion in the policy:

> **2.     Exclusions**

> This insurance does not apply to:

> ***

> **d.     Liquor License Not in Effect**

> "Injury" arising out of any alcoholic beverage sold, served or furnished while any required license is not in effect.

---

[23] "Exhibit I" is document 47-9 in the Court's CM/ECF system.

[24] The Court has omitted the following argument from this paragraph: "Thus, an adjuster acting on behalf of NMFIC was managing, handling, and adjusting the claims under both the NMFIC Policy and the NMIC Policy and lumped the analyses of these policies into one letter."

(Ex. B, p.20-21). . . .[25] Nineteenth Street held a valid liquor license, **SBE** held a valid business license and the subject sale was made pursuant to that legal authority.

27.     In the same letter, **NMFIC** asserted that the NMIC Policy excluded coverage for liquor liability citing the following exclusion in the NMIC Policy:

### B.     Exclusions

#### 1.     Applicable To Business Liability Coverage

This insurance does not apply to:

\*\*\*

#### c.     Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of

---

[25] The Court has omitted the following argument from this paragraph:

NMFIC ignored the undisputed fact that a valid liquor license was "in effect" for the subject alcohol sale at the 14th Street BP and erroneously and in bad faith sought to apply the above exclusion. NMFIC disregarded the fact that the policy exclusion language did not require that the liquor license be in the name of the named insured, but rather, the policy merely excludes coverage when "any required license is not in effect" -*i.e.* an illegal sale of alcohol by an unlicensed store.

alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies **only if** you are **in the business of** manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

(Ex. I).[26] **NMFIC** also states in the letter "While we argue that **SBE** did not and could not have furnished any alcoholic beverages to Brittany Caffee because **SBE** does not operate the business that would have done so, this is an issue that will ultimately be determined by a court of law. The applicable policy exclusions will depend on the ultimate finding."[27]

\* \* \*

29.    . . . [O]n April 26, 2010, **NMFIC** and/or **NMIC**[28] sent another letter [to Sabbah and SBE] that reaffirmed the ROR defense and the fact that coverage will hinge on issues that will be decided by a court of law.

---

[26] The Second Amended Complaint notes that emphasis was added here. (Doc. 47 at 14, ¶ 27).

[27] The Court has omitted the following argument from this paragraph:

The position taken by NMFIC that SBE did not operate the convenience store and did not have a liquor license (in support of its possible exclusion of coverage under the NMFIC policy) clearly triggers coverage for such claims under the NMIC policy where coverage for such claim was excluded "only if you are in the business of" selling alcohol. Ironically, NMFIC contradicts itself in its attempts to disclaim coverage under both policies when coverage under both policies should have been accepted by NMFIC and NMIC.

[28] The letter states that "Nationwide Mutual Fire Insurance Company ('Nationwide') has examined the claims made against you by the above-referenced claimant." (Doc. 47-10 at 2). It discusses <u>both</u> policies at issue in this case.

After April 26, 2010, no additional coverage letters or ROR letters were ever sent by **NMFIC** and/or **NMIC** to **PLAINTIFFS**. (see Exhibit J[29]; also at Doc. 1-2).[30]

\* \* \*

### D.   Offers to Settle

32.    In the years following the accident, the Claimants made several offers to settle and would have settled all of their claims against the **PLAINTIFFS** for an amount within the $1,000,000 limits of either policy. Such offers to settle were communicated orally and in writing on numerous occasions.

33.    Specifically, on March 3, 2011, Claimants, by and through one of their counsel Patrick M. Lavette, notified **NMFIC** and/or **NMIC** in writing via a letter to **PLAINTIFFS'** counsel (in the underlying case) Kori Clement that Claimants would accept the available $1,000,000 policy limits in order to settle all of the Claimants claims against **PLAINTIFFS**. (see Exhibit K[31]; also at Doc. 1-3).

34.    In this letter, Mr. Lavette points out the following critical facts:

    (a)    The Defendants' motions for summary judgment have been denied and the court has indicated that all issues –

---

[29] "Exhibit J" is document 47-10 in the Court's CM/ECF system.

[30] The Court has omitted the following conclusory statements from the statement of facts:

    30.    Pursuant to the policy language in both policies, it is undisputed that SBE was a named insured and the subject claims made by the Claimants were covered.

    31.    Pursuant to the policy language in both policies, it is undisputed that SABBAH was an insured as defined in the definitional section of the policy and the subject claims made by the Claimants were covered.

[31] "Exhibit K" is document 47-11 in the Court's CM/ECF system.

including the corporate identity issues – will go to trial.

(b)     All living plaintiffs ([C]laimants) will testify that alcohol was illegally purchased by Caffee from the 14th Street BP convenience store. It is undisputed that she became intoxicated from that alcohol and crashed as a result of her intoxication. She was underage, was not carded, and the sale was illegal.

(c)     One of the largest verdicts in Jefferson County history arose from a liquor liability action in the same court, the Bessemer cut off. In that case [*Chambliss v. Applebee's*], CV-96-744, a Bessemer jury returned a $13,000,000 judgment against Applebee's for overserving a 20-year-old girl who later died in a single-vehicle car crash.

(d)     This case is even more tragic in that a 13-year-old boy was killed, 2 other teenagers were seriously injured, and there is a potential for multiple large verdicts.

(e)     The case for disregarding the corporate form is especially strong considering Mr. Sabbah regularly commingles assets among the various corporations and uses whichever corporate entity is more advantageous or convenient in certain circumstances. For example, **SBE** makes all the oil and gas purchases for 19th Street yet 19th Street claims these expenses for income tax purposes. **SBE** claims to own all of the shares of 19th Street yet for personal income tax purposes Mr. Sabbah claims that he owns all the shares. Money is regularly moved from one corporation to another and Sabbah regularly draws money out of both Corporations. Bills of one corporation are regularly paid by the other. Little accounting work appears to have been done to distinguish between the corporations. The evidence is clear that Mr. Sabbah operates all of these corporations for his own benefit and that he, **SBE**, and 19th are essentially one and the same.

(f)     Sabbah and **SBE** are clearly covered by the Nationwide insurance policy.

(g)     The parties clearly obtained dram shop liability coverage for the convenience store operating at the 600 14th Street location.

(h)     the defense posture in this case is that the 2 insured entities – Sabbah and **SBE** – have no liability in this matter and the entity that sold the alcohol – Nineteenth St. – has no insurance. Although this might be a favorable result for Nationwide, it is a potentially disastrous result for Nineteenth Street and for Mr. Sabbah.

(i)     All of the plaintiffs agree to accept the $1 million policy limits available and to dismiss all claims.

35.     Based on the legal and factual posture of the case, the trial court [in the underlying cases] decided that a bifurcated trial was necessary. The first trial would be against Nineteenth Steet Investments, the named operator of the **14TH STREET BP**, and a jury would decide whether the operator of the store was liable pursuant to the Dram [S]hop Acts for the subject accident and the resulting damages suffered. If the Claimants prevailed in the jury trial against the operator, then a bench trial would be conducted several months later to determine the liability of **SBE** and **SABBAH** for the previously issued judgment against the operator.

36.     Despite attempts by the Claimants to settle the case within limits prior to the first trial, **NMFIC** and **NMIC** refused to ever make an offer under either policy.

### E.     The Verdicts and Appeal

37.     On or about February 8, 2013, the Claimants received a jury verdict totaling Fifteen Million, One Hundred Fifty Thousand and no/100 Dollars ($15,150,000.00) against Nineteenth (1st phase of trial) in the following amounts:

| Sharon Robertson [obo] Andrew Robertson | $7,000,000 |
| Jennifer Vickery | $3,900,000 |
| Michael Waldrop | $3,750,000 |
| Tammy Hardin | $500,000 |
| | $15,150,000 |

38. On March 14, 2013, despite having just received a $15,150,000 jury verdict against Nineteenth, Claimants, by and through one of the counsel of record Patrick M. Lavette, notified **NMFIC** and **NMIC** in writing that Claimants would accept the available $1,000,000 policy limits in order to settle all of the Claimants claims against all of the insureds--Nineteenth, **SBE** and **SABBAH**. It was known at this time that a separate bench trial would occur later that year which would decide as a matter of law and fact whether Nineteenth's corporate veil should be pierced and judgment entered against **SBE** and **SABBAH**. (See Exhibit L[32]; also at Doc. 1-4).

39. On April 10, 2013, **SABBAH** and **SBE** made demand upon **NMFIC** and **NMIC** in writing via a letter to Kori Clement that **NMFIC** and/or **NMIC** must pay the available $1,000,000 policy limits in order to settle all of the Claimants' claims and in order to protect the insureds. No offer was ever made.

40. On November 1, 2013, the Claimants and **PLAINTIFFS** concluded the second phase of the trial (non-jury) which encompassed four days of testimony and evidence.

41. On December 20, 2013, the trial court entered a Final Consolidated Judgment in which it used its equitable powers to bind **SBE** and [**SABBAH**] to the judgments against Nineteenth. The trial court then entered a $15,150,000 judgment against **SABBAH**, **SBE**, and Nineteenth.

42. Despite the Claimants' and **PLAINTIFFS'** demands for settlement, neither **NMFIC** or **NMIC** ever made a single offer under

---

[32] The Court notes that "Exhibit L" is the March 14, 2013, letter from Lavette to Clement.

either policy to settle these cases.

43.     On July 31, 2014, **PLAINTIFFS** filed a notice of appeal of the underlying court's judgment.

44.     Instead of protecting **PLAINTIFFS** by posting a full supersedeas bond (or seeking a lesser bond from the Alabama Supreme [C]ourt to secure the judgment through appeal) to cover the judgment and post-judgment interest as required by Alabama Rule of Appellate Procedure 8(a)(1), **NMFIC** and **NMIC** refused to post a bond and failed to honor the language in both policies that required that a bond be posted. The posting of the required bond would have secured the judgment, protected the insureds, and staved off collection efforts by Claimants during the pendency of the appeal. Instead, the failure to post a bond has left **PLAINTIFFS** exposed to the multi-million dollar judgment.

45.     On November 20, 2015, the Alabama Supreme Court affirmed the judgments without opinion.

(Doc. 47 at 3-20) (emphasis and italics in original except where otherwise noted).

## IV.     PROCEDURAL CONSIDERATIONS

### A.     <u>Judge Acker's Opinion</u>

In a December 16, 2015, Order, Judge William M. Acker, Jr., to whom this case was originally assigned, wrote:

> "[A] cause of action arising out of a failure to settle a third-party claim made against the insured does not accrue unless and until the claimant obtains a final judgment in excess of the policy limits." *Evans v. Mut. Assur., Inc.*, 727 So. 2d 66, 67 (Ala. 1999). However, a cause of action for "a first-party claim wherein . . . the insurer had, in bad faith, refused to pay a legitimate claim made by the insured on his own policy . . . accrues the moment the insurer refuses, in bad faith, to honor the claim,

and that the insurer cannot absolve itself of liability by subsequently tendering payment." *Id*. at 68. Under both tort theories, the applicable statute of limitations is two years. ALA. CODE. § 6-2-38.

In this case, plaintiffs argue that their claims contained in Counts I, II, and III of their complaint are third-party bad faith claims where "a liability insurance carrier[] fail[s] to protect its insured from a third-party claim." (Doc. 11 at 7). *See Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So. 2d 1, 5 (Ala. 1981) ("third[-]party actions involv[e] . . . recovery against the insurer in situations where the insurer wrongfully refuses, either negligently or intentionally, to settle the third[-]party claim within policy limits and where, as a result, the insured incurs a judgment against him in an amount in excess of the policy"). Therefore, judgment having been entered against plaintiffs on December 20, 2013 by the Circuit Court of Jefferson County (Doc. 1 at 5-6, 13) and post-judgment motions having been denied on June 20, 2014 by the Supreme Court of Alabama (Doc. 1 at 13; Doc. 11 at 5), Counts I, II, and III were timely filed on October 13, 2015 within the two year statute of limitations.

(Doc. 16 at 3) (footnote omitted). In an important footnote, Judge Acker also wrote:

A close reading of plaintiffs' complaint suggests that as to at least one defendant, Counts I, II, and III do not arise from refusal to settle with third-party claimants in favor of going to trial, but rather appear to arise from refusal to settle because plaintiffs were not covered by the policy. (Doc. 1 at 8-11); *see Fed. Ins. Co. v. Travelers Cas. & Sur. Co.*, 843 So. 2d 140, 143 (Ala. 2002) (finding third-party liability arises from the insured relinquishing control of the defense and settlement of the action to the insurer because "reliance on the abilities and good faith of the insurer is therefore necessarily at a maximum"). Specifically, plaintiffs allege defendants refused to ever defend or indemnify Nineteenth Street "[b]ecause it was not listed as the named insured." (Doc. 1 at 7). Additionally, plaintiffs allege defendants initially denied coverage for plaintiffs while still offering "a 'courtesy defense' wherein it agreed to pay for counsel but expressly refused coverage and denied any indemnity whatsoever." (Doc. 1 at 8). Plaintiffs allege that defendants later replaced this arrangement with "a defense under a reservation of

rights . . . [where plaintiffs] 'may not be covered under the policies.'" (Doc. 1 at 8). <u>While plaintiffs contend Counts I, II, and III are third-party liability claims, the facts contained in their complaint and attached insurance policy language and communications instead may support only first-party claims for bad faith refusal to pay by an insurer;</u> however, plaintiffs' conflation of both defendants, and defendants' limited grounds for its motion to dismiss, make adjudication of these issues not ripe for review.

(Doc. 16 at 3, n. 2) (emphasis added).

## B.     The Bankruptcy of Nineteenth Street and the Adversary Proceeding

On September 9, 2011, Nineteenth Street filed a Petition for Relief under Chapter 7 of the United States Code in the United States Bankruptcy Court for the Northern District of Alabama, Southern Division. (Doc. 1-1 at 1). On September 23, 2015, Andre M. Toffel, in his capacity as trustee of the bankruptcy estate of Nineteenth Street, filed an adversary proceeding against NMIC, Patricia Donaldson, and the Pat Donaldson agency. Asserting many of the same allegations as are set out in the instant case, Toffel alleged liability for: Negligent/Wanton Failure To Procure Insurance Coverage (Count One); Breach of Contract (Count Two); and Bad Faith Refusal To Defend, Indemnify, and Settle (Count Three).

District Judge Karon O. Bowdre withdrew the reference of the case from the bankruptcy court and, on August 15, 2016, dismissed the case. As to the bad faith claim she wrote:

Under Alabama law, " '[t]he statute of limitations for bad faith claims arising on or after January 9, 1985, is two years.' " *Jones v. Alfa Mut. Ins. Co.*, 875 So. 2d 1189, 1193 (Ala. 2003) (*quoting ALFA Mut. Ins. Co. v. Smith*, 540 So. 2d 691, 692 (Ala. 1988)); see also Ala. Code § 6-2-38. " 'The cause of action for bad faith refusal to honor insurance benefits accrues upon the event of the bad faith refusal, or upon the knowledge of facts which would reasonably lead the insured to a discovery of the bad faith refusal.' " *Jones*, 875 So. 2d at 1193 (*quoting Safeco Ins. Co. of America v. Sims*, 435 So. 2d 1219, 1222 (Ala. 1983)). A letter denying insurance coverage should be sufficient to "put a reasonable mind on notice of the possible existence of fraud" and, thus, to trigger the running of statute of limitations for a bad faith refusal claim. *Farmers & Merchants Bank v. Home Ins. Co.*, 514 So. 2d 825, 831-32 (Ala. 1987).

In the instant case, Nationwide's July 19, 2007 letter denying coverage was sufficient to put Nineteenth Street on notice of Nationwide's possible bad faith. Nationwide's denial is the event that forms the basis for Toffel's bad faith claim. Therefore, the court finds that the statute of limitations for Toffel's bad faith refusal to defend claim **began to run on July 19, 2007** and **expired on July 19, 2009.** Toffel's bad faith claim asserted in the adversarial proceeding filed on September 6, 2013 was untimely.

\* \* \*

Toffel argues in response that[] his claims are not barred by the statute of limitations because Nineteenth Street's claims did not accrue until a final judgment was entered against it in the state court lawsuits.

Toffel contends that the Defendants have failed to recognize the distinction between first-party and third-party insurance cases, and that in third-party insurance cases, the cause of action does not accrue until a final judgment is entered against the insured.

In support of this argument, Toffel cites third-party failure to settle cases. In the context of third-party failure to settle cases, Alabama

courts have held that "a cause of action arising out of a failure to settle a third-party claim made against the insured does not accrue unless and until the claimant obtains a final judgment in excess of the policy limits." [*Evans v. Mut. Assur., Inc.*, 727 So. 2d 66, 67 (Ala. 1999)].

In his original Complaint, Toffel did not assert a failure to settle claim. Rather, Toffel asserted claims for negligent failure to procure insurance and bad faith refusal to defend, indemnify, and settle. Toffel argues, without citing any case law, that the distinction made between first-party and third-party claims in the failure to settle context applies to claims for negligent procurement and bad faith refusal to defend as well. Alabama courts, however, have not pronounced this distinction as broadly as Toffel suggests.

Additionally, this case is distinguishable from the third-party cases that hold that a claim does not accrue until final judgment. For example, in *Evans*, a doctor was sued in a wrongful death action. 727 So. 2d 66. The doctor's malpractice insurer undertook to represent him with a reservation of rights in the wrongful death action. The case went to trial, and the jury returned a verdict against the doctor. While the case was on appeal, the malpractice insurer settled the case for an amount in excess of the doctor's $1 million coverage limit. The doctor alleged that his insurer should have settled the case before trial within his $1 million policy limit. No dispute existed in *Evans* as to whether the doctor's claim was covered. *Id.*

In the instant case, however, Nineteenth Street knew that Nationwide did not intend to provide any coverage for its claim or defend it in the state court lawsuits as of the date it sent Nineteenth Street the denial letter, July 19, 2007. Unlike the insurance company in *Evans*, Nationwide did not agree that Nineteenth Street's claim was covered and did not undertake to defend the suits against it.

Moreover, in the typical liability insurance contract, "the insured expressly relinquishes to the insurer the right to control the defense and settlement of any action arising under the contract. The insured's reliance on the abilities and the good faith of the insurer is therefore

necessarily at a maximum." *Federal Ins. Co. v. Travelers Cas. & Sur. Co.*, 843 So. 2d 140, 143 (Ala. 2002). When a third-party files a claim against the insured, the insured sends that claim to the insurer, and the insurer accepts coverage and controls the defense and settlement of the insured's case. The insured will not be injured, if at all, until the insurer fails to settle the case within the insured's policy limits.

In the present case, Nationwide never agreed to defend Nineteenth Street in the state court lawsuits. Nationwide did not take control of the defense and settlement of the state court lawsuits. Therefore, the policy concerns implicated in the typical third-party failure to settle case are not present in the instant case. Nineteenth Street was injured, and its cause of action accrued, on the date that Nationwide denied coverage of its claim, even though the full extent of its damages were not known until the state court entered judgments against it. *See Chandiwala v. Pate Constr. Co.*, 89 So. 2d 540, 543 (Ala. 2004) ("A cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of the damage is apparent at the time of the first legal injury.") (citations omitted). The statute of limitations on Nineteenth Street's claim began to run on the date Nationwide denied it coverage. The third-party failure to settle cases cited by Toffel are inapplicable to the present case.

Therefore, the court finds that Toffel's claims against the Defendants are due to be dismissed because they are barred under the applicable statutes of limitations.

*Toffel v. Nationwide Mut. Ins. Co.*, No. 2:15-CV-01669-KOB, 2016 WL 4271837, at

*7–8 (N.D. Ala. Aug. 15, 2016). Judge Bowdre also refused to allow Toffel to amend

the complaint to add a claim for negligent/wanton failure to settle, writing:

Toffel's new claim for negligent/wanton failure to settle would likewise be barred under the applicable statute of limitations. As discussed previously, Nineteenth Street was injured when Nationwide refused to provide it with coverage. The accrual rule stated in third-party failure to

23

settle claims is inapplicable to this case because Nationwide did not agree to defend Nineteenth Street, and Nineteenth Street never relinquished its control or ability to settle the state court lawsuits. Therefore, the statute of limitations period for Toffel's negligent failure to settle claim would have expired as of July 19, 2009 – two years from the date that Nationwide denied coverage of Nineteenth Street's claim. Toffel's adversary proceeding filed in 2013 was untimely.

*Toffel*, 2016 WL 4271837, at *9.

On September 12, 2016, Toffel filed a motion, pursuant to Rule 59(e), to alter or amend Judge Bowdre's final judgment. (Doc. 24 in *Toffel v. Nationwide Mutual Ins. Co., et al.*, 2:15-cv-01669-KOB). As of the date of this opinion, that motion remains pending before Judge Bowdre.

### C. This Court's Order of September 7, 2016 [Doc. 46]

In this Court's Order of September 7, 2016, the Court denied a then-pending motion to dismiss, allowed the Plaintiffs to file a Second Amended Complaint, and otherwise wrote:

The Court has thoroughly examined the record and notes that there is an issue as to whether at least some of the Plaintiffs' claims are barred by the applicable statute of limitations. Although this potential issue was noted in the footnote to Judge Acker's opinion, and the Defendants purport to "renew their motion to dismiss due to the lapse of the applicable limitations period" (doc. 19 at 18), there is no real argument on this point by either side in the most recent briefs. Further, the court is inclined to reconsider Judge Acker's order to the extent that it impacts these issues. Too, although it was inappropriate to reassign this case to Judge Bowdre (doc. 44), the Court would be remiss if it did not at least consider why her ruling should not persuade this Court's approach. This

point has not been addressed by the parties.

(Doc. 46 at 19) (footnotes omitted). The Court then allowed the filing of another amendment, in part to allow for "a more thorough analysis" of these issues. (Doc. 46 at 20).

## V.    ANALYSIS

### A.    <u>Statute of Limitations</u>

The Defendants first argue that "it is apparent from the face of the Second Amended Complaint that Plaintiffs' <u>claims</u> are first-party claims" . . . "barred by the applicable statutes of limitations." (Doc. 50 at 10) (emphasis added). The Court will address in more detail below distinctions between first-party and third[-]party claims. However, it notes first that there are <u>fifteen</u> separate counts in the Second Amended Complaint. They can be categorized as follows: claims asserting negligent/wanton failure to settle (Counts One, Two, and Three); claims asserting bad faith (Counts Four, Five, Six, Seven, Eight, and Nine); claims asserting "breach of the enhanced duty and obligation of good faith" (Counts Ten and Eleven); claims alleging breach of contract (Counts Twelve and Thirteen); and claims requesting a declaration as to coverage (Counts Fourteen and Fifteen). The general reference by the Defendants to the Plaintiffs' "claims," without distinguishing among them, is unhelpful to the Court.

Nevertheless, without citing to authority, the Defendants argue that <u>all</u> of the

claims in the Second Amended Complaint are "first-party refusal to pay" claims, and insist that "first-party claims for refusal to pay, whether alleging breach of contract, bad faith, negligence or wantonness, begin to run when an insurer disclaims coverage." (Doc. 50 at 11; *see also*, doc. 50 at 16 ("Whether founded upon breach of contract, bad faith or negligence/wantonness . . . the claims are necessarily in the first-party insurance context[.]").  The Plaintiffs also lump all of their claims together when they state that their "<u>claims</u>[] arise out of the fiduciary duties an insurer owed its insured with respect to a third-party liability claim." (Doc. 54 at 6) (emphasis added).[33]

The Court deems it more appropriate to analyze whether the statute of limitations has run as to each <u>category</u> of claim asserted.

### 1. *"First-Party" vs. "Third-Party" Claims*

It is appropriate to first step back and clarify what is meant by "first-party" and "third-party" claims. The terms are most often defined in the context of the law of bad faith.

It has been noted that

---

[33] In a footnote to this statement, the Plaintiffs cite to the following language from *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So. 2d 387, 391–92 (Ala. 1989): "The insurer has a fiduciary duty to look after the insured's interest at least to the same extent as its own." *Hollis* was a <u>negligent failure to settle</u> case, not a bad faith case. Accordingly, *Hollis* cannot stand for the proposition that <u>all</u> of the categories of the Plaintiffs' claims arise from the fiduciary duty recognized in *Hollis*.

> Lawyers and judges tend to use the term "third-party bad faith" loosely to refer to bad faith cases involving liability insurance policies. In most cases, this usage causes no harm. To be accurate, however, one should reserve the term "third-party bad faith" for bad faith cases <u>based on a liability insurer's failure to accept a third-party claimant's offer to settle his claim against the insured</u>.

Stephen S. Ashley, *Bad Faith Actions: Liability & Damages* § 3:1 (2d ed.) (emphasis added). "[T]hird-party common law bad faith consists of conduct by a liability insurer which exposes its insured to an excess judgment when the insurer could have and should have settled [a] claim against its insured within policy limits." 14 Steven Plitt, et al., *Couch on Ins.* § 206:8. "Unlike the third-party case, first-party bad faith inherently involves the insurer's refusal to pay a claim of its own insured on the ground that it is not within the coverage, is overstated, or has not yet been adequately proved." 14 Steven Plitt, et al., *Couch on Ins.* § 204:28.

In Alabama, third-party claims sound in <u>both</u> bad faith and negligence. The Alabama Supreme Court first recognized such third-party claims in *Waters v. Am. Cas. Co. of Reading, Pa.*, 261 Ala. 252, 73 So. 2d 524 (1953). In *Waters*, the Plaintiff, Waters, owned a theater in Birmingham, Alabama in which a patron was injured. The patron and her husband sued Waters for their respective injuries.[34] Waters had $5,000 in liability insurance with American Casualty Company of Reading, Pennsylvania

---

[34] The husband's claim was for loss of consortium.

("American Casualty"). After damage awards totaling $18,500 were obtained against

Waters, American Casualty paid the $5,000 it owed under the policy. Waters then

sued American Casualty for the difference, alleging negligence "in that: Defendant,

its servants, agents and attorneys negligently failed or refused to settle said claim for

damages against this defendant for the sum of $5,000 within the limits of said

policy," and bad faith in that

> the defendant failed to perform the duty it owed this plaintiff and the
> exercise of good faith in the negotiations for the settlements of said
> claims and suits, but, on the contrary, wrongfully and in bad faith, and
> acting for its own interests, wrongfully failed, declined or refused to
> settle said claim after the institution of said suits against this plaintiff.

*Waters*, 73 So. 2d at 528.

The Alabama Supreme Court ruled that liability under such circumstances may

be based on either negligence or bad faith. On rehearing, the Court wrote:

> There is a field of operation for both aspects of liability: that is,
> negligence in one, and bad faith in the other. We cannot set aside the
> principle of liability for negligently performing a contract as set forth in
> the opinion supra. It may arise when an insurer is engaged in performing
> his contractual duty owing to the insured to defend the suit. The law
> raises a duty not contractual, but by reason of the contract, to exercise
> ordinary diligence in doing so. A failure to exercise ordinary diligence
> proximately causing damage to the insured is actionable in tort. The
> contract of insurance gives the insurer the exclusive right to make a
> settlement of the claim against insured. That right imposes a
> corresponding duty raised by law to observe ordinary diligence in
> performing that power, when in the exercise of it. So that, when an
> opportunity is presented to the insurer to make a settlement of the claim

in an amount not more than the limit of liability, the law raises a duty on his part to use ordinary care to ascertain the facts on which its performance depends if he has not already done so. If the insurer neglects to exercise ordinary diligence in ascertaining these facts, if he has not already done so, and as a proximate result of such neglect he fails to make such a settlement, which is available, and when such knowledge would have caused a reasonably prudent person to do so, and a verdict and judgment are rendered against insured in an amount more than the limit of liability in the policy, the insurer should be held liable to the insured for the full amount of the judgment.

If the insurer has already made the investigation and ascertained the facts, to which we have referred supra, and refuses to make such proffered settlement, if such refusal is due to the honest judgment of insurer that the facts do not warrant such a settlement, and the insurer was not negligent in the manner of defending the suit, he would not be liable to insured for an amount in excess of the limit of liability provided in the policy, although the verdict and judgment were in excess of it. But if such refusal to settle <u>under those circumstances</u> is the proximate result of bad faith on the part of the insurer, he would be liable for the full amount of the judgment, notwithstanding it is in excess of the limit fixed in the policy.

*Id.* at 531–32 (emphasis added).

Some years later, in *Hartford Acc. & Indem. Co. v. Cosby*, 277 Ala. 596, 173 So. 2d 585 (1965) the Alabama Supreme Court, discussing third-party bad faith, wrote:

"In our opinion the insurer cannot escape liability by acting upon what it considers to be for its own interest alone, but it must also appear that it acted in good faith and dealt fairly with the insured. The insurer, as it had a right to do under the policy, <u>assumed exclusive control of the</u> <u>claim against the insured, and took unto itself the power to determine for</u> <u>the insured all questions of liability, settlement, of defense and</u>

management before and during trial, and of appeal after final judgment. We are of [the] opinion that this relationship imposes upon the insurer the duty, not under the terms of the contract strictly speaking, but because of and flowing from it, to act honestly and in good faith toward the insured. It was open to the jury to find that the insurer did not perform this duty."

*Cosby*, 173 So. 2d at 592–93 (emphasis added) (*quoting Am. Mut. Liab. Ins. Co. of Boston, Mass. v. Cooper*, 61 F.2d 446, 448 (5th Cir. 1932)). One year later, in *Nationwide Mut. Ins. Co. v. Smith*, 280 Ala. 343, 194 So. 2d 505 (1966), the Alabama Supreme Court asked, somewhat rhetorically:

> [W]ould not the refusal of an insurer, after diligent investigation of the facts, and having under the insurance contract exclusive control of the litigation and sole right of settlement, be negligent if under all the facts the offer of settlement was one which an ordinarily prudent person would accept under like or similar circumstances? And would not a refusal to settle under such circumstance negative in law a claimed exercise of 'honest judgment,' and raise a question of fact for submission to a jury.

*Smith*, 194 So. 2d at 512 (emphasis added).

In 1989, the Alabama Supreme Court seemed to answer its question from *Smith* in *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So. 2d 387. In *Hollis*, the cause of action was "negligent or wanton failure to settle." The Alabama Supreme Court, quoting *Waters*, again noted that when "the contract of insurance gives the insurer the exclusive right to make a settlement of the claim against insured . . . [t]hat right imposes a corresponding duty raised by law to observe ordinary diligence in

performing that power, when in the exercise of it." *Hollis*, 554 So. 2d at 389 (*quoting Waters,* 73 so. 2d at 531). The court also noted that "the *Waters* criteria" was reaffirmed in *Smith*, and quoted the above referenced passage from *Smith*. *Id.* at 391.

### 2. *The Bad Faith Claims [Counts Four, Five, Six, Seven, Eight, and Nine]*

#### a. **The Bad Faith Claims in the Instant Case Are First-Party Claims.**

Based on the case law set out above, the Court agrees with the general propositions stated by both Judge Acker[35] and Judge Bowdre that, when an insurer expressly disclaims coverage and the Plaintiffs, not the insurers, control all aspects of the underlying litigation, the bad faith claims are first-party claims. This conclusion is buttressed by the rationale for, and genesis of, third-party bad faith and negligence claims discussed above, all of which have the common threads of no denial of coverage and the <u>insurer</u> controlling the litigation. *See also*, *Fed. Ins. Co.*

---

[35] The Plaintiffs argue that Judge Acker "has already decided the statute of limitations issue," and "his determination is 'law-of-the-case' and should not be disturbed." (Doc. 54 at 7, n. 4). First, it can hardly be said that Judge Acker "decided" the statute of limitations issue. Indeed, he specifically stated that "plaintiffs' conflation of both defendants, and defendants' limited grounds for its motion to dismiss, make adjudication of these issues <u>not ripe for review</u>." (Doc. 16 at 3-4, n. 2) (emphasis added). *Cf. Hamilton v. Florida*, 793 F.3d 1261, 1264-65 (11th Cir. 2015) ("A decision not to decide a question is not a decision of the question."). Second, even if Judge Acker <u>had</u> made such a determination, the "law-of-the-case" doctrine would not apply to prevent this Court from taking a second look. "'Under the law of the case doctrine, both district courts and appellate courts are generally bound by a prior <u>appellate</u> decision in the same case.'" *Newman v. Ormond*, 456 F. App'x 866, 867 (11th Cir. 2012) (emphasis supplied) (*quoting LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1285-1286 (11th Cir.2010)). There has been no appeal in this case.

*v. Travelers Cas. & Sur. Co.*, 843 So. 2d 140, 143 (Ala. 2002) (noting that one of the rationales behind the creation of the third-party bad faith action was that "[i]n a typical insurance contract, the insured expressly relinquishes to the insurer the right to control the defense and settlement of any action arising under the contract. The insured's reliance on the abilities and the good faith of the insurer is therefore necessarily at a maximum.").

On July 17, 2007, the Defendants sent a letter to both SBE and Sabbah denying coverage on the claims and offering a "courtesy defense" to SBE. (Doc. 47 at 10, ¶21; doc. 47-6). In that same letter, the Defendants stated that <u>SBE</u>

> will be responsible for any settlement offers, responses to settlement offers and any judgment(s) rendered in this matter. Furthermore, [SBE] will be in charge of the defense of this matter, [we] will merely pay the fees associated with the defense.

(Doc. 47-6).[36] The Second Amended Complaint also alleges that on February 23, 2009, the Defendants sent <u>Sabbah</u> a letter expressly disclaiming coverage. (Doc. 47 at 11, ¶24; doc. 47-8 at 3). In that same letter, the Defendants wrote:

> [Y]ou will be responsible for any settlement offers, responses to settlement offers and any judgment(s) rendered in this matter. Furthermore, you will be in charge of the defense of this matter, [we]

---

[36] Document 47-6 is a copy of the letter, which was also attached as an exhibit to the Second Amended Complaint. "[O]n a motion to dismiss, [the district court] may consider not only the complaint but also the exhibits attached to it." *Gross v. White*, 340 F. App'x 527, 533 (11th Cir. 2009) (*citing Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir.2000)).

will merely pay the fees associated with the defense.

(Doc. 47-8 at 9). These letters clearly reflect that the Defendants were disclaiming coverage and would not be taking control over the underlying litigation.

### b. All of the Bad Faith Claims Are Bad Faith "Refusal to Honor Insurance Benefits" Claims

The Plaintiffs argue that this case is factually distinguishable from *Toffel* because in that case "Judge Bowdre's opinion focused on [the] bad faith failure to defend claim," and, in the instant case, "multiple bad faith theories are presented." (Doc. 54 at 9) (citing chart of claims at doc. 54-1 at 2).[37] First, the bad faith claim before Judge Bowdre was bad faith "Refusal to Defend, Indemnify and Settle." *Toffel*, 2016 WL 4271837, at *2. Regardless, she determined that, based on the facts alleged in the complaint before her, the claim was actually a claim for bad faith <u>refusal to honor insurance benefits</u>. *See id* at *7. The Court agrees with Judge Bowdre's approach. Despite the fact that the claims in the instant case are called bad faith "failure to properly investigate, defend, and settle" (Counts Four, Five, and Six) or

---

[37] The Plaintiffs also argue that "Judge Bowdre's [opinion] in *Toffel* hinged on four specific circumstances that might have applied to [Nineteenth Street], but [do not apply] to Plaintiffs." (Doc. 54 at 7). Then, over three plus pages of their brief they discuss the fact that: 1) Nineteenth Street was not a named insured on the policy; 2) the Defendants completely rejected coverage as to Nineteenth Street; 3) the Defendants completely refused to defend Nineteenth Street; and 4) Nineteenth Street was immediately injured on July 2, 2007, when it was refused a defense. (*See*, doc. 54 at 7-9). As noted above, Judge Bowdre based her opinion that the bad faith claims in her case were first-party claims on the fact that <u>the insurers disclaimed coverage and relinquished control of the defense</u>. Those same facts are present here.

bad faith "failure to indemnify" (Counts Seven, Eight, and Nine), all allegations in each count arise out of the Defendants' initial disclaimer of coverage. This makes each count a claim for bad faith refusal to honor insurance benefits.[38]

### c. The Statute of Limitations on the Bad Faith Claims Has Run

The statute of limitations for a bad faith refusal to honor insurance benefits claim "accrues upon the event of the bad faith refusal, or upon the knowledge of facts which would reasonably lead the insured to a discovery of the bad faith refusal." *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 30 (Ala. 2008) (internal quotations and citations omitted). In *Toffel*, Judge Bowdre correctly held that a letter sent to Nineteenth Street, which was similar to the ones sent to the instant Plaintiffs, "was sufficient to put Nineteenth Street on notice of [the Defendants'] possible bad faith. [The] denial is the event that forms the basis for [the] bad faith claim." *Toffel*, 2016 WL 4271837, at *7. The same is true in this case.

The Court holds that the statute of limitations for the Plaintiffs' bad faith claims began to run on July 19, 2007, when Kelly Jackson sent a letter to SBE and

---

[38] Alternatively, if the Court treats the bad faith claims as third-party claims, they are due to be dismissed pursuant to Rule 12(b)(6) because the facts as pled do not support such claims which are not viable when the insurers have expressly disclaimed coverage and relinquished control of the defense of the case.

Sabbah denying coverage. The statute expired two years later, on July 20, 2009[39].

Assuming that all of the bad faith claims, filed in any version of the Complaint, relate

back to the original Complaint filed on October 13, 2015, they are untimely and due

to be dismissed.[40]

### 3. *The Negligent/Wanton Failure To Settle Claims [Counts One, Two, and Three]*

As noted, the parties treat the negligence and bad faith claims together. This

is unfortunate because "these are in fact two distinct claims." *Mut. Assur., Inc. v.*

*Schulte*, 970 So. 2d 292, 296 (Ala. 2007). However, as noted above, the Alabama

Supreme Court in *Hollis* confirmed that the same standard for third-party liability

applicable to bad faith cases also applies to negligence cases. *See Hollis*, 554 So. 2d

at 389–90. Judge Bowdre's opinion in *Toffel* recognized this fact when she refused

to allow an amendment to add a claim for "negligent/wanton failure to settle." She

found any such amendment would be futile because

> Toffel's new claim for negligent/wanton failure to settle would likewise
> be barred under the applicable statute of limitations. As discussed
> previously, Nineteenth Street was injured when Nationwide refused to
> provide it with coverage. The accrual rule stated in third-party failure to

---

[39] Two years exactly would have been July 19, 2009, which was a Sunday.

[40] The bad faith claims are still untimely if the Court assumes that the statute did not run for Sabbah until February 23, 2009, when NMFIC and NMIC sent a letter to him disclaiming coverage. That statute expired on February 23, 2011, well before the initial Complaint was filed in this case (on October 13, 2015).

> settle claims is inapplicable to this case because Nationwide did not
> agree to defend Nineteenth Street, and Nineteenth Street never
> relinquished its control or ability to settle the state court lawsuits.
> Therefore, the statute of limitations period for Toffel's negligent failure
> to settle claim would have expired as of July 19, 2009 – two years from
> the date that Nationwide denied coverage of Nineteenth Street's claim.
> Toffel's adversary proceeding filed in 2013 was untimely.

*Toffel*, 2016 WL 4271837, at *9. Thus, Judge Bowdre's opinion implicitly and correctly recognized that all of the claims by Nineteenth Street, whether based on bad faith, negligence, or wantonness, were first-party claims subject to a two year statute of limitations which began to run when the Defendants first disclaimed coverage.[41]

This Court agrees with Judge Bowdre's approach and holds that it is equally applicable to the Plaintiffs in the instant case. In Alabama, "[t]he statutory limitations period for filing a negligence action is two years." *Singer Asset Fin. Co. v. Connecticut Gen. Life Ins. Co.*, 975 So. 2d 375, 382 (Ala. Civ. App. 2007) (citing § 6-2-38). "A negligence cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of damages is apparent at the time of the first legal injury." *Gilmore v. M & B Realty Co.*, 895 So. 2d 200, 208 (Ala. 2004) (*quoting Koch v. State Farm Fire & Casualty Co.*, 565 So.2d 226, 231

---

[41] The case before Judge Bowdre also included a claim for breach of contract which was omitted from the proposed amended complaint. Accordingly, Judge Bowdre found that claim to be "no longer at issue." *Toffel*, 2016 WL 4271837 at *6.

(Ala.1990)). Despite the nomenclature used by the Plaintiffs,[42] the essence of Counts One, Two, and Three is that the Defendants failed to do <u>anything</u> for the Plaintiffs because the Defendants claimed there was no coverage. As noted previously, coverage was disclaimed in the July 17, 2007, and February 23, 2009, letters the Defendants sent to the Plaintiffs. At that time, the negligence claims accrued. Therefore, the statute of limitations for the Plaintiffs' negligence claims began to run, at the latest, on February 23, 2009, with the letter to Sabbah, and expired on February 23, 2011. Even assuming that all of the negligence claims, filed in any version of the Complaint, relate back to the original Complaint filed on October 13, 2015, they are untimely and due to be dismissed.

### 4.    *Breach of Contract [Counts Twelve and Thirteen]*

As noted herein,[43] in *Toffel*, Judge Bowdre did not have a breach of contract claim. There are two such claims in the instant case–Counts Twelve and Thirteen–both based on the Defendants' failure to indemnify the Plaintiffs. As noted by the Alabama Court of Civil Appeals:

> Under Alabama law an insurance contract is governed by the same general rules as other contracts. *Auto-Owners Ins. Co. v. Culpepper*, 426 So.2d 435 (Ala.Civ.App.1983); *Southern Guaranty Ins. Co. v. Rhodes*,

---

[42] Counts One, Two, and Three are entitled "Negligent/Wanton Failure [T]o <u>Settle</u>."

[43] *See, supra*, note 41.

46 Ala.App. 454, 243 So.2d 717 (1971). . . . Therefore, the applicable statute of limitations is six years. *Culpepper*; § 6-2-34(4), Ala.Code 1975. "The statute of limitations on a contract action runs from the time a breach occurs rather than from the time actual damage is sustained." *AC, Inc. v. Baker*, 622 So.2d 331 (Ala.1993).

*Hackleburg Church of Christ v. Great Am. Ins. Companies, Inc.*, 675 So. 2d 1309, 1311 (Ala. Civ. App. 1995); *see also*, *Ex parte Stonebrook Dev., L.L.C.*, 854 So. 2d 584, 588 (Ala. 2003) ("[In] a contract action . . . the cause of action accrues at the time of breach even if no actual damage is sustained[.]") (*citing Bass Pecan Co. v. Berga*, 694 So.2d 1311 (Ala.1997)).

As noted previously, the Defendants' argument as to these claims suffers from being lumped in with the negligence and bad faith claims. In their motion to dismiss, the Defendants discuss the statute of limitations applicable to contract claims in Alabama (*see* doc. 50 at 11), and assert that the claims for breach of contract should also be analyzed under the first-party/third-party framework set out above (*see* doc. 50 at 16). However, they offer no argument or authority that the above analysis applies to claims for breach of contract. Because their argument is underdeveloped, the Court will deny their motion to dismiss the breach of contract claims based on the running of the statute of limitations, but will order further briefing on this issue.

5. ***The Breach of the Enhanced Duty and Obligation of Good Faith Claims [Counts Ten and Eleven]***

The Alabama Supreme Court has noted that the enhanced duty of good faith

recognized in *L & S Roofing Supply Co. v. St. Paul Fire & Marine Insurance Co.*, 521

So.2d 1298 (Ala.1988),

> arises under the insurance contract, because no reservation of rights
> would take place without the underlying duty of the insurer to defend
> the insured, and that duty is created by that contract. Because the
> enhanced duty arises from the contract, it follows that <u>claims alleging a
> breach of the enhanced duty of good faith are contract claims</u>.

*Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 839 So. 2d 614, 616 (Ala.

2002) (emphasis added). Accordingly, these claims as well are subject to a six year

statute of limitations.

The first-party/third-party analysis conducted as to the other claims is

inapplicable to these claims because, unlike the claims discussed thus far, these

claims are not based on the disclaimer of coverage. Instead, they are based on the

conduct of the Defendants and the Plaintiffs' counsel regarding the "courtesy

defense" provided to the Plaintiffs in the underlying cases. Unfortunately, because the

Defendants lump all of the Plaintiffs' claims together, they do not address this

distinction. In their <u>reply</u> brief, the Defendants do argue that the six year statute of

limitations applicable to these claims began to run in 2007 because "Plaintiffs allege

that Defendants and Plaintiffs' counsel in the underlying suit 'ignored the obvious

conflicts and violations of *L & S Roofing*' beginning in 2007." (Doc. 55 at 7)(quoting

and citing doc. 54 at 11-12). This argument is not sufficient. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014) (noting that arguments raised for the first time in a reply brief should not be considered).[44] To the extent that the motion to dismiss argues that these counts are untimely, it will be denied.

6.  ***The Declaratory Judgment Counts [Counts Fourteen and Fifteen]***

The Defendants make no argument that these counts are untimely filed. To the extent that the motion to dismiss can be read to argue that these counts are untimely filed, it will be denied.

**B.  There Is No Breach of the Enhanced Duty and Obligation of Good Faith Here**

Where, as in the instant case, an insured accepts the defense of an action under reservation of rights, but never relinquishes control of the lawsuit, including settlement negotiations, to the insured, the insurer does not have an "enhanced obligation of good faith" to its insureds. *Aetna Cas. & Sur. Co. v. Mitchell Bros.*, 814 So. 2d 191, 196 (Ala. 2001) (The criteria for complying with the enhanced obligation of good faith "necessarily assume that the insurer is controlling the investigation, the defense of the lawsuit, and settlement negotiations."). The motion to dismiss is due to be granted as to Counts Ten and Eleven.

---

[44] The Court ultimately determines that this claim is due to be dismissed.

## C. The Plaintiffs' Argument that the Defense of the Underlying Cases Was *De Facto* Controlled by the Defendants

The Plaintiffs argue that, despite the clear statements from the Defendants that Sabbah and SBE each would be in charge of their own defense, the Defendants <u>actually controlled</u> the defense, and thus the claims in this case are third-party claims.[45] (Doc. 54 at 10). This argument is based on the fact the Defendants "assigned the defense of SBE and Sabbah to Clement, who also undertook the defense of NSI by separate agreement," and that the Defendants controlled the defense because they "controlled Clement." (Doc. 54 at 11; *see also* doc. 54 at 12 ("Defendants . . . controlled the defense through Clement[.]")). More specifically, the Plaintiffs argue that the Defendants

> controlled Clement, relying on her for the coverage opinion in this case that resulted in the initial denials, and later on, the reservation of rights about coverage. ([Doc. 47 (Second Amended Complaint)] at ¶¶68 (dd), 120.) After the original coverage opinion, Defendants continued to keep Clement involved in coverage issues throughout the litigation, copying her on both reservation of rights letters authored by Defendants. (*Id*. at ¶¶115, 116; Docs. 47-9, 47-10.)

(Doc. 54 at 11; *see also generally*, doc. 54 at 11-16).

---

[45] This argument appears in the section of the Plaintiffs' brief which addresses the applicable statute of limitations as to first-party versus third-party claims. Thus, the Court assumes that it is directed toward that aspect of the Plaintiffs' argument. However, to the extent that the Plaintiff is arguing that the Defendants' control over the litigation, through Clement, violated their enhanced duty of good faith, the Court finds, as shown *infra*, that there are no facts alleged in the Complaint which plausibly establish that there in fact was any such control.

The "coverage opinion" cited by the Plaintiffs is Clement's July 17, 2007, letter to the Defendants where she states, among other things: "We may also seek to avoid liability by arguing that NSI, rather than SBE, sold the beverages to Ms. Caffee;" and "we believe it is unlikely that we will prevail by showing that NSI, and not SBE, dispensed the liquor, but we will pursue the facts regarding that argument." (Doc. 54 at 12) (quoting from doc. 47-5 at 8-9). The Plaintiffs then argue:

> What could be stronger evidence of control than Clement plotting with Defendants to seek to avoid liability for SBE (the named insured) by arguing and putting liability on the uninsured NSI (also her client). She even goes so far as to state that "we will pursue the facts regarding this argument." Just two days after Clement's letter, Defendants sent the letter to SBE denying coverage but offering the "courtesy defense."

(Doc. 54 at 13). The Plaintiffs also argue that the March 3, 2011, letter from counsel for the Claimants, to Clement, evidences that Clement actually implemented this plan.[46] The Plaintiffs cite no authority for the proposition that such interactions between counsel and the insurer can convert a first-party claim into a third-party claim, and the Court is aware of none.

---

[46] In that letter, counsel for the Claimants wrote Clements, among other things, that

It appears that the defense posture in this case has been to take the position that the two insured entities-Sabbah and SBE-have no liability in the matter, while also taking the position that the entity which sold the alcohol-Nineteenth Street-has no insurance. Although this might be a favorable result for Nationwide, it is a potentially disastrous result for Nineteenth-and for Mr. Sabbah.

(Doc. 47-11 at 4).

Regardless, the letter merely outlines Clement's strategy. Furthermore, the Plaintiffs allege no facts which support an allegation that Clements employed this strategy <u>at the request of the Defendants</u>. They merely argue that

> [t]hese well-pleaded factual allegations support the claims of Defendants' bad faith and improper control of the defense of SBE and Sabbah and are asserted throughout the Complaint. For instance, Plaintiffs allege that Defendants "wrongfully, and in bad faith, fabricated a defense strategy," "fabricated alleged coverage defenses to create a negotiating strategy," "implemented this strategy through the use of counsel," "attempted to wrongfully manipulate the attorneys for the Claimants … [by] fraudulently encourag[ing] the Claimants to walk away from their claims," and used these strategies "to wrongfully manipulate" Plaintiffs. (Doc. 47 at ¶¶ 67, 68, 68(g), 73, 73(g), 68(h), 73(h)).

(Doc. 54 at 14). These are mere "labels or conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 557.

Also, in the third-party context the insurer retains "exclusive control of the claim against the insured, and . . . the power to determine for the insured all questions of liability, settlement, of defense and management before and during trial, and of appeal after final judgment." *Cosby*, 173 So. 2d at 592–93. Clement's letter does not evidence that type of control by the Defendants. Indeed, as the Plaintiffs note, it was <u>after</u> this letter, on July 19, 2007, that Kelly Jackson sent a letter to SBE and SABBAH on behalf of both NMFIC and NMIC denying coverage on the claims and offering a courtesy defense to SBE on behalf of those entities. It was that letter in

which the Defendants stated that

> Sabbah Brothers Enterprises, Inc. will be responsible for any settlement offers, responses to settlement offers and any judgment(s) rendered in this matter. Furthermore, Sabbah Brothers Enterprises, Inc. will be in charge of the defense of this matter, Nationwide will merely pay the fees associated with the defense.

(Doc. 47-6 at 7). While it can be reasonably inferred that Clement's letter of July 17, 2007, <u>might</u> have influenced the Defendants' decision to deny coverage, no plausible inference can arise from that letter that the Defendants <u>controlled</u> the litigation. No other facts are alleged which demonstrate that the Defendants actually maintained control over the litigation, or that, if the Plaintiffs had wanted to settle, or go to trial, or do anything else, that the Defendants would have interfered. Indeed, the allegations in the Complaint make it clear that the Defendants did <u>nothing</u> in this regard, including refusing to make a single offer of settlement (doc. 47 at 20, ¶42), and refusing to post an appeal bond (doc. 47 at 20, ¶44).[47]

---

[47] The Plaintiffs also argue:

By directly involving Clement in the coverage discussions and defense, rather than creating a wall between the coverage issues and the defense, Defendants ignored the obvious conflicts and violations of [*L & S Roofing Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 521 So. 2d 1298 (Ala. 1987)] implicit in such joint representation (*Id.* [at ¶¶115, 116; Docs. 47-9, 47-10]) Defendants had frequent inappropriate correspondence with Clement about matters bearing on coverage, interfered with and affected her defense of the insureds, and completely failed to heed their enhanced obligation of good faith which required them to allow counsel to represent only her client. (Id.) As stated in the Complaint, "it is clear that both NMIC and NMFIC were participating in the defense of Plaintiffs." (Doc. 47 at ¶ 21.) Defendants not only controlled the defense through Clement, but did so in such a way to the absolute

44

Finally, and importantly, even if somehow Clement was "controlled" by the Defendants, that would still not convert this action into a third-party action. As this Court noted above, the rationale for, and genesis of, third-party bad faith and negligence claims is the insurer's control over the litigation <u>where the insurer agrees there is coverage</u>. Under such circumstances "[t]he insured's reliance on the abilities and the good faith of the insurer is therefore necessarily at a maximum." *Fed. Ins. Co.*, 843 So. 2d at 143. There are no facts alleged by the Plaintiffs which would support any allegation that they were relying on the Defendants' to "abilities" and "good faith" to handle the case for them. Indeed, such an allegation would be <u>implausible</u> considering the fact that the Defendants expressly denied coverage and also expressly stated that SBU and Sabbah were solely responsible for the defense of the case.

---

detriment of its insureds.

(Doc. 54 at 11-12). They continue:

> Defendants improperly participated in the defense, in direct violation of *L & S Roofing* and the required enhanced obligation of good faith; failed to hire competent defense counsel for the insureds that owed a duty of undeviating loyalty to her client; and inappropriately corresponded with counsel about matters bearing on coverage and Defendants' position on coverage issues. (Doc. 47 at ¶¶115, 116.)

(Doc. 54 at 14). This is merely a rehash of the *de facto* control argument. The Plaintiffs have cited no authority that a breach of any obligation set out in the *L & S Roofing* case is grounds for converting a first-party case into a third-party case.

## D.    The Reservation of Rights Letters

The Plaintiffs argue:

> Defendants also subsequently accepted the defense of Plaintiffs under a reservation of rights. (Doc. 47 at ¶¶25, 29.) The ROR letters informed Plaintiffs that Defendants "will need your full cooperation as provided in the policies." (Docs. 47-9 at 7; 47-10 at 8.) Plaintiffs cooperated and fulfilled all duties and obligations under both policies. (Doc. 47, ¶¶ 16-17.) Hoping to circumvent these facts, Defendants assert the subsequent ROR letters did not "purport to revoke the prior coverage disclaimers[,]" and did not "provide that Defendants assumed control of settlement decisions … ." (Doc. 50 at 15.) This argument makes no sense. If Defendants' coverage position had not changed since 2007, then why were the ROR letters issued in the first place? The April 26, 2010 letter clearly references "more amended complaints [that] have now been filed" and acknowledges that "additional information" can change NW's coverage position. (Doc 47-10 at 1, 7.) Clearly, these new complaints implicated coverage. Moreover, if the coverage denial was still in place, then why was that critical denial position not clearly reiterated in the ROR letters (particularly in light of the new amended complaints referenced)? Finally, and perhaps most persuasively, if the coverage denial was still in place then why do the ROR letters say that NW "reserves the right. . . . .to limit or preclude coverage" based on issues that "will ultimately be determined by a court of law"? (Id. at 3, 7.) Obviously, there would be no reason to notify the insured that their coverage may be "limited or precluded" if it has already been denied!

(Doc. 54 at 14-15) (footnotes omitted).

The two letters referred to by the Plaintiffs were dated April 3, 2009, and April 26, 2010. (Docs. 47-9, 47-10). Importantly, the Plaintiffs cite no language (because there is none) in the letters which states that there <u>is</u> coverage or states that the

Defendants have changed their mind about their previous denial of coverage.[48] The Plaintiffs cite no language in the letters (again, because there is none) where the Defendants state that they are assuming control over the litigation and defense of the case against the Plaintiffs, or that they have changed their minds regarding their previous relinquishment of that control. Finally, the Plaintiffs cite no <u>conduct</u> by the Defendants, after the letters were sent, inconsistent with their earlier denial of coverage and relinquishment of control. Indeed, the Plaintiffs specifically allege that nothing changed after these letters were sent that "[d]espite attempts by the Claimants to settle the case within limits prior to the first trial, [the Defendants] refused to ever make an offer under either policy." (Doc. 47 at 18, ¶ 36). Finally, as with the Plaintiffs' argument regarding *de facto* control, the Plaintiffs cite no authority, and the court is aware of none, for the proposition that a reservation of rights letter from an insurer revokes an earlier denial of coverage.[49, 50]

---

[48] In fact, in the April 3, 2009, letter the Defendants stated: "Based on [their] review, Nationwide has determined that the claim presented by this claimant <u>may not be covered under the policies</u>." (Doc. 47-9 at 2) (emphasis added). The same language appears in the letter of April 26, 2010. (Doc. 47-10 at 2).

[49] Even if it did, it is undisputed that, on May 2, 2013, the Defendants <u>again</u> denied coverage. (Doc. 47 at 32, ¶68(k)). If all else fails, the statute of limitations for the first-party tort claims would have begun to run on <u>that</u> date, and would have expired on May 2, 2015. The instant action was not filed until October 13, 2015. (Doc. 1). In response to this argument, the Plaintiffs note:

> Notably, this communication was after the $15M verdict but before the "veil piercing" part of the trial had occurred. It did not create any change in Defendants'

## E.    All Other Arguments for Dismissal

To recap, thus far the Court has found that all claims in this case are due to be dismissed except the breach of contract claims against NMFIC and NMIC (Counts Twelve and Thirteen), which the Court has stated might have been filed beyond the applicable statute of limitations, and the claims for declaratory judgment against NMFIC and NMIC (Counts Fourteen and Fifteen). The court also notes that, thus far, it has not addressed the Defendants' additional grounds for dismissal which include

---

ongoing actions toward its insureds because Defendants continued to provide and control the defense of the case. Filing a bad faith claim would have been premature at best because Plaintiffs could have won the "veil piercing" argument.

(Doc. 54 at 16, n. 7). This argument is without merit. As this Court has shown, in the "first-party" context, the claim accrues upon the denial of coverage, not when the Plaintiffs were damaged (when the veil was pierced).

[50]   The Plaintiffs argue:

Moreover, the approach that Defendants would have this Court adopt would require every insured to immediately initiate a claim for bad faith upon receipt of a reservation of rights letter, or, indeed, any letter that offered anything less than an irrevocable full defense and indemnity to the insured. This situation would not only violate the public policy against a multiplicity of lawsuits . . . , but would simply be impracticable and unworkable, given the overall number of insurance claims made and the routine nature of reservation of rights letters. It is probably not an overestimate to say that millions of such letters are sent by insurance companies every year. The accrual rules for third-party bad faith cases . . . are based on sound practical and policy grounds.

(Doc. 54 at 16-17).  The Court rejects this argument.  As noted above, the practical and policy grounds for the creation of the third-party bad faith claim do not exist in this case.  The Plaintiffs in the instant case, and all such plaintiffs in first-party cases, must file their action within the applicable statute of limitations, which begins to run upon the initial denial of coverage.

that: there is no coverage under the policies (doc. 50 at 17-25; doc. 55 at 7-22); the liquor liability exclusion applies to exclude coverage (doc. 50 at 25-28); Sabbah is not an insured under the policies (doc. 50 at 28-29); and the Plaintiffs' "alter-ego" claims lack merit (doc. 50 at 29-31).

It seems that if the breach of contract claims are also due to be dismissed as untimely filed, the issue as to coverage (and thus the need for declaratory relief on that point) becomes moot.[51] Thus, judicial resources would be best spent reviewing further briefing on the statute of limitations issue, as applied to the breach of contract claims, before delving into coverage issues. All coverage/exclusion based grounds for dismissal cited by the Defendants will therefore be **DENIED without prejudice**.

## VI. CONCLUSION

Based on the foregoing it is hereby **ORDERED, ADJUDGED**, and **DECREED** as follows:

1.     The motion to dismiss is **DENIED** as to the breach of contract claims against NMFIC and NMIC (Counts Twelve and Thirteen), and the claims for declaratory judgment against NMFIC and NMIC (Counts

---

[51] Under Alabama law, an insurer's duty to defend is more extensive than its duty to indemnify. *Mid-Continent Cas. Co. v. Advantage Med. Elecs., LLC*, 196 So. 3d 238, 243 (Ala. 2015). That does not seem to be an issue in this case, however, as the Defendants provided the Plaintiffs with a defense.

Fourteen and Fifteen).

2. As to all other counts in the Second Amended Complaint (Counts One through Eleven), the motion is hereby **GRANTED**. Counts One through Eleven in the Second Amended Complaint are hereby **DISMISSED with prejudice.**

3. No later than May 31, 2017, the Defendants may file a new motion to dismiss which addressed **ONLY**: 1) whether the statute of limitations has run as to the breach of contract claims; and 2) whether a decision that the statute of limitations <u>has</u> run as to the breach of contract claims moots the claims for declaratory relief. The initial brief may be no longer than 10 pages, double spaced, in 14-point type. Any response brief should be filed no later than June 14, 2017, and is subject to the same typeface and page limitations as the initial brief. The movant's reply brief may be filed no later than 7 days after the date on which the response brief was due. The reply is subject to the same typeface limitations as the initial and response briefs, but may not exceed 5 pages in length.

**DONE** and **ORDERED** this 11th day of May, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge